516 So.2d 1231 (1987)
Don J. GINES, et ux, Plaintiffs/Appellees,
v.
STATE FARM FIRE AND CASUALTY CO., et al, Defendants/Appellants.
No. 19149-CA.
Court of Appeal of Louisiana, Second Circuit.
December 2, 1987.
Writ Denied February 5, 1985.
*1232 Barham, Adkins & Tatum by T.J. Adkins, Danny W. Tatum, Ruston, for plaintiffs/appellees.
Mayer, Smith & Roberts by Walter O. Hunter, Jr., Shreveport, for defendants/appellants.
Before HALL, C.J., and MARVIN and JASPER E. JONES, JJ.
HALL, Chief Judge.
This is a products liability action involving a gas central heating unit, an automatic vent damper and a flue pipe. The plaintiffs, Mr. and Mrs. Don J. Gines, were seriously injured by carbon monoxide gases emitted by a heating unit located in their daughter and son-in-law's home in Ruston, Louisiana. The gases escaped into the home after the flue pipe was inadvertently dislodged from the automatic vent damper by workers installing a new roof on the home.
The plaintiffs filed suit against Carrier Corporation, the manufacturer of the heating unit and the damper; Faulkner Corporation, the installer of the Carrier equipment and the flue pipe; Jimmy L. Myles, the roofing contractor; and various insurance companies. Prior to trial, plaintiffs settled with Faulkner and its insurer but reserved their rights against the other defendants.
Following a jury verdict in favor of the defendants, the trial judge granted plaintiff's motion for a judgment notwithstanding the verdict and rendered judgment against Carrier. The trial judge awarded Mr. Gines $2,777.35 in special damages and $350,000.00 in general damages. Mrs. Gines was awarded $739.80 in special damages and $375,000.00 in general damages. Applying principles of comparative fault, the trial judge found Carrier and Faulkner each to be 50% at fault and reduced the judgment against Carrier accordingly. Mr. Myles was found to be free from fault by the trial judge and was dismissed from the suit.
*1233 Carrier appeals seeking a reversal of the finding of liability on its part. Alternatively, Carrier seeks to decrease the percentage of fault assigned to it by the trial court. Plaintiffs answered the appeal seeking an increase in the amount of the judgment and an increase in the percentage of fault assigned to Carrier. We affirm the judgment of the district court.
The Facts
A gas central heating unit and an automatic vent damper manufactured by Carrier were installed in a closet in a Ruston, Louisiana home by Faulkner employees in 1979. As part of the installation work, the Faulkner employees also put in sections of flue pipe to vent the fumes from the heating unit to the roof. The method of connection between the damper and the first section of flue pipe is the focus of our inquiry. The damper was situated directly on top of the heating unit and was designed so that the first section of flue pipe slipped over the rim of the damper, forming the connection. The damper was not designed with a locking device to hold the flue pipe in place nor was there any warning on the damper alerting the installer of the need for a secure connection between the damper and the flue pipe. The installation instructions accompanying the damper did not instruct the installer to use screws to secure the first section of the flue pipe to the rim of the automatic vent damper and Faulkner employees testified that when, as in this case, they executed a "vertical" installation where the vent pipe went straight up from the heating unit to the roof they did not use screws to attach the vent pipe to the heating unit. They testified that they relied on the weight of the vent pipe to hold it in place over the heating unit. The evidence showed that no screws were used to attach the flue pipe to the automatic vent damper in the instant case.
The plaintiffs' daughter and son-in-law, Dr. and Mrs. John R. Schweitzer, bought the home in 1980. Subsequently, the Schweitzers contracted with Mr. Myles for a new roof. The roofing work was done on Friday, February 25, 1983. That same day Mr. and Mrs. Gines arrived in Ruston for a visit. The family, which also included the Schweitzer's two children, retired earlier than usual that Friday evening as all were feeling tired. Sometime thereafter the entire family was overcome by carbon monoxide poisoning and remained in various states of unconsciousness or semi-consciousness until being rescued on Monday, February 28.
The Schweitzers and the Gines testified that during the weekend they were disoriented and confused, with no sense of the passing of time. They suffered acute physical distress such as vomiting and the loss of control of normal bodily functions. Mrs. Gines fainted and lay unconscious in the bathroom, yet none of the other family members could decide what to do to help her. Dr. and Mrs. Schweitzer testified that they would become aware of their teenage daughter's illness, or realize that their infant needed to be checked on, but would be unable to follow through with concrete action. Not until Monday was anyone able to call for outside help. When friends arrived, they found the house in total disarray and rushed the family to the hospital.
Inspection of the home by the Arkla Gas Company and neighbors disclosed that the flue pipe was not connected to the damper. The flue pipe had apparently been dislodged when the roofers replaced the shingles around the flue pipe. Mr. Myles testified that the flue pipe has a base at the roof level which can be lifted up and down. He testified that the normal procedure for replacing a roof only necessitated the lifting of the base one-fourth to three eights of an inch and did not require the lifting of the flue pipe. He stated that this action would not dislodge the flue pipe from the heating unit if the flue pipe was securely fastened.
As a result of the carbon monoxide poisoning, both Mr. and Mrs. Gines sustained permanent brain damage. Mr. Gines also suffered a broken ankle and at the time of trial was still suffering from extreme depression, loss of self-esteem and self-confidence, frequent nightmares and suicidal *1234 tendencies. He also had trouble with his hearing, his speech and his balance.
Mrs. Gines' brain damage was more severe than her husband's. She remained in a state of total helplessness for approximately two months after the accident. During this period she was described as having lost contact with reality. At the time of trial she was still unable to drive, cook, shop, carry on a cohesive conversation, calculate numbers, or spell. She was also suffering from severe depression, nightmares, disorientation, memory loss and radical mood swings.
Trial Court Findings
After the trial, the jury answered special interrogatories in which it found that the heating unit and damper were improperly designed but were not unreasonably dangerous in normal use. The jury did find however that the Carrier equipment was unreasonably dangerous in normal use due to Carrier's failure to adequately warn of inherent dangers in the equipment. They did not however find that this failure to warn was a substantial cause of the accident.
In granting the judgment notwithstanding the verdict, the trial judge reasoned that the jury's factual determination that the failure to warn caused the Carrier equipment to be unreasonably dangerous was inconsistent with the jury's finding that the failure to warn was not a contributing cause of the accident. The trial judge noted that the Carrier literature did not adequately instruct installers on the need to use screws or the reason behind this necessity and explained that Carrier was not free to rely totally upon the expertise of installers in the field, especially when such a hazardous condition was involved. He concluded that Carrier's failure to warn was a substantial cause of the accident. The trial judge also found that the design of the automatic vent damper, in connection with the failure to warn, was a contributing factor in bringing about the resulting accident.
In regard to Faulkner's negligence, the jury found that the equipment had been improperly installed and that this was a substantial cause of the plaintiffs' injuries. The trial judge agreed with the jury's finding that Faulkner's failure to properly install was partially responsible for the plaintiffs' injuries. Neither the jury nor the trial judge found any negligence on the part of the roofer. The trial judge equally divided the fault between Carrier and Faulkner.
Liability
Carrier contends that the trial court erred in finding it liable based upon its failure to warn. Carrier argues that a warning was not necessary because the installer was aware of the danger of carbon monoxide poisoning and therefore aware of the need for a secure connection between the heating unit and the flue pipe. They also contend that it was the general custom in the heating installation industry to use sheet metal screws to secure this connection. Additionally, they rely on certain statements in the instruction pamphlet accompanying the heating unit which tells the installer to install the venting system securely and in accordance with local codes. Alternatively, defendants argue that even if their warnings are deemed inadequate, the installer was more at fault than they were and therefore the trial court erred in assessing them with 50% of the fault.
Plaintiffs, on the other hand, contend that Carrier was in the best position to have prevented the accident and therefore should be found 100% at fault. They argue that if a warning had been present the installer would have heeded it. They also argue that the instruction pamphlet accompanying the automatic vent damper was inadequate since it did not advise the installer of the need to use sheet metal screws with the particular model of damper at issue. They contend that it was foreseeable that installers might not use sheet metal screws at this connection and that without these screws, the flue pipe could easily become disconnected. The plaintiffs also argue that the damper could have been designed with an automatic locking device which would have prevented the flue pipe *1235 from being disconnected without the necessity of the installer having to take affirmative action.
To recover in a product liability case the plaintiff must prove that the harm resulted from the condition of the product, that the condition made the product unreasonably dangerous to normal use and that the condition existed at the time the product left the manufacturer's control. A product may be deemed unreasonably dangerous to normal use if the manufacturer fails to adequately warn about a danger related to the way the product is designed. A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user. Normal use is a term of art which includes intended foreseeable use and reasonably foreseeable misuse. It is not limited to operation of the product exactly in accordance with the manufacturer's instructions. In performing this duty a manufacturer is held to the knowledge and skill of an expert. Bloxom v. Bloxom, 512 So.2d 839 (La.1987); Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986). The manufacturer is presumed to know the vices in the things he makes whether or not he has actual knowledge of them and once the product is proven defective by reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the manufacturer in its manufacturing or processing. Toups v. Sears, Roebuck and Co., Inc., 507 So.2d 809 (La. 1987); Weber v. Fidelity & Casualty Insurance Co. of N.Y., 259 La. 599, 250 So.2d 754 (1971).
The Carrier unit by its design and nature emitted carbon monoxide gases and unless properly vented presented an unreasonable danger. Accordingly, the manufacturer had a duty to provide adequate warnings and instructions as to proper venting. It was not established that the use of metal screws was the invariable practice or even the usual or standard practice of installers and the statement in the installation instructions referring the installer to local codes was insufficient to ensure that screws would be used. It was not reasonable for Carrier to assume that the installers would be experts in installation or cognizant of local city codes. Carrier should have warned the installer of the danger of carbon monoxide gases escaping if the vent pipe was not securely fastened and should have instructed the installer to use a secure fastening device such as metal screws. Had such instructions and warnings been given, it is presumed that they would have been followed, and if followed the vent pipe would not have been dislodged and the accident would not have happened. Thus, the failure to provide adequate warnings and instructions was a cause in fact of the accident and the injuries to plaintiffs. Additionally, the evidence indicated that the damper could have been designed so as to require a secure connection, such as the snap-lock used to secure the flue pipe sections to each other. Such a design could have been adopted without substantial cost or problems, and would have eliminated or reduced the likelihood of installer error. Still, if adequate warnings and installation instructions had been provided, the design used would not have been defective. However, this was not done and, therefore, the design, without adequate instructions, was unreasonably dangerous and defective.
The trial court correctly found Faulkner was also negligent and at fault. Faulkner's employees testified they were aware that the heating unit emitted carbon monoxide gases. Given this knowledge, a reasonable person acting in the capacity of a professional installer would have taken care to securely fasten the pipe so it could not be dislodged. The expert witnesses were in general agreement that the vent pipe could and should have been securely fastened with metal screws. It was estimated that this procedure could have been accomplished in a matter of minutes at minimal cost. Faulkner was negligent in not using screws to fasten the vent pipe to the damper even though the instructions furnished by Carrier did not mention or require the use of metal screws. Faulkner's negligence combined with Carrier's *1236 failure to warn and provide adequate installation instructions in causing the accident. We find no fault with the trial court's apportionment of fault equally to Carrier and Faulkner.
Damages
Plaintiffs contend that they suffered severe and permanent injuries and that the trial court abused his discretion in failing to award them sufficient damages.
Before a general damage award can be altered on appeal, the record must show a clear abuse of the trial court's much discretion. The initial inquiry must always be directed at the particular injuries and their effects on a particular injured person. It is only after an articulated analysis of the facts discloses an abuse of discretion that the award may on appellate review, for articulated reasons, be considered either excessive or insufficient. Only after such determination of abuse has been reached is a resort to prior awards appropriate for purposes of then determining what would be an appropriate award for the present case. Reck v. Stevens, 373 So.2d 498 (La.1979).
Plaintiffs were in their late fifties at the time of the accident and were retired. Their injuries have had a drastic and permanent effect on their lives and activities. Their losses are substantial, but then so are the awards.
After a careful review of the evidence we find that the amounts awarded by the trial judge were adequate to compensate the plaintiffs for the injuries they sustained and were not so low as to amount to an abuse of his much discretion.
For the reasons assigned, the judgment of the district court is affirmed at appellants' cost.
AFFIRMED.