557 So.2d 739 (1990)
Shirley Louise Wallis WATSON and Wilma Joy Watson Bruce, Plaintiffs-Appellants,
v.
C.R. BARD, INC. and Aetna Life and Casualty Co., et al., Defendants-Appellees.
No. 21276-CA.
Court of Appeal of Louisiana, Second Circuit.
February 28, 1990.
Rehearing Denied March 29, 1990.
Writ Denied May 25, 1990.
*740 Rountree, Cox & Guin by Gordon E. Rountree, Shreveport, for plaintiffs-appellants.
Lunn, Irion, Johnson, Salley & Carlisle by James B. Gardner, Comegys, Lawrence, Jones, Odom & Spruiell by John S. Odom, Jr., Shreveport, for defendants-appellees.
Before FRED W. JONES, Jr., NORRIS and LINDSAY, JJ.
*741 LINDSAY, Judge.
The plaintiffs, the widow and the daughter of the decedent, Harrison M. Watson, appeal from a trial court judgment rejecting their demands against the surgeon who implanted the decedent's aortic graft, and the manufacturer of the graft and its insurer. For the following reasons, we affirm in part and reverse in part.

FACTS
The decedent had a heart attack on February 7, 1982. His treating physician, Dr. William D. Bailey, referred him to a cardiologist, Dr. Thomas Smith. In April of 1982, he underwent double coronary bypass surgery, during which an abdominal aortic aneurysm was noted by the cardiovascular surgeon, Dr. James Stanford Shelby. The aneurysm did not require repair at that time. During the surgery, the decedent suffered another heart attack. Nonetheless, the decedent recovered remarkably well.
In May, 1983, the decedent suffered a mild stroke. Once again he made an excellent recovery and returned to work as manager of a bowling alley. During the course of the decedent's long treatment, Dr. Smith put him on Coumadin, a blood thinner.
Eventually, the doctors determined that the aneurysm required corrective surgery. They delayed the surgical procedure until they felt the decedent's health had improved. On November 1, 1983, Dr. James R. Bruner performed an abdominal aortic aneurysm resection on the decedent to correct the aneurysm. To this end, the surgeon made an incision in the abdomen, retracted the intestines, and opened the peritoneum, or posterior wall of the abdomen. Dr. Bruner then was able to view the aorta and to determine the size of the graft which was required. In the present case, he chose a 20 millimeter bifurcated graft.[1] The graft was then preclotted in its original package by the insertion of 30 cc's of blood from the patient's aorta. After visually sizing the graft, Dr. Bruner made the necessary transverse cuts to properly size it and then sutured it into place.
The decedent was released from the hospital on November 9, 1983. On December 1, 1983, Dr. Bruner found him to be recovering well. However, he was seen in the emergency room on December 17, 1983, with early signs of pneumonia. Additionally, he was hospitalized from December 31, 1983, to January 4, 1984, due to bleeding in the intestines caused by the Coumadin therapy. At this time, Dr. Smith stopped the decedent's Coumadin treatment for several days before resuming it at a reduced dosage.
Beginning about February 14, 1984, the decedent was seen at different times by Dr. Bailey and Dr. Bruner for complaints of left hip pain. Dr. Bruner saw him on February 16, 1984. Dr. Bailey saw him in the emergency room on February 19 and in his office on February 23, 1984.
On February 25, 1984, the decedent was feeling ill and remained in bed. At one point he asked his wife to assist him in getting out of bed. While his wife was helping him get up, he said, "My back is killing me." Suddenly, Mr. Watson collapsed. His eyes rolled back, his mouth fell open, and the color drained from his face. Mrs. Watson immediately summoned emergency assistance. An ambulance arrived, and the decedent was taken to the Bossier Medical Center.
Dr. Smith and Dr. Bailey were called. Emergency room personnel at Bossier Medical Center were unable to resuscitate the decedent. He was pronounced dead while in the emergency room. Dr. Smith and Dr. Bailey both saw the decedent in the emergency room and observed that his abdomen was tight and markedly distended (like a nine-month pregnancy, in Dr. Bailey's opinion). They suspected that the decedent had died from a sudden massive rupture of the aorta or of one of the suture lines of the graft.
*742 At the request of the physicians, Mrs. Watson consented to a partial autopsy. Dr. George McCormick, the coroner of Caddo and Bossier Parishes, performed the autopsy on February 26, 1984. He found a tear on the posterior side of the right leg of the graft which he concluded had caused the decedent to bleed to death. Based upon the autopsy report, Dr. Bailey signed the death certificate which listed the cause of death as hypovolemic shock (shock caused by drastic reduction of the volume of blood in the body) as a result of the rupture of the graft.
On October 26, 1984, the decedent's wife, Shirley Louise Wallis Watson, and his grown daughter from a prior marriage, Wilma Joy Watson Bruce, filed suit against the manufacturer of the graft, C.R. Bard, Inc., and its insurer, Aetna Life and Casualty Company, alleging defective manufacture of the graft. In a supplemental and amending petition filed May 19, 1986, the plaintiffs added Dr. Bruner as a defendant, alleging that his negligence in implanting the graft had caused the decedent's death.
A jury trial on the merits began on October 11, 1988, and concluded on October 17, 1988. The parties stipulated that the graft in question was designed and manufactured by Bard. The graft was then obtained by Bossier Medical Center via a middleman in Dallas, Texas. The parties further stipulated that when the graft was received by the medical center, its condition had not changed since it left the manufacturer. Aetna's insurance coverage of Bard was also stipulated.
The plaintiffs both testified, as did the decedent's employer, Don Coleman. They also presented the testimony of Dr. Smith, Dr. Bailey, and Dr. McCormick. Nurse Jeanne Neill testified as to the chain of custody of the graft and its presurgery condition. Melvin Harju, PhD, an expert in economics, testified as to the defendant's worklife expectancy and lost wages. Dr. Bruner and one of Bard's experts on implantable knitted fabrics, Mr. Milo Titone, were called on cross-examination.
Bard and Aetna presented the testimony of Mr. Titone, Helen Estakhrian, PhD, also an expert in knitted fabrics, and Dr. Shelby, the doctor who performed the decedent's bypass surgery in April of 1982. Dr. Bruner testified on his own behalf. The decedent's widow was called as a rebuttal witness.
The jury returned verdicts in favor of the defendants. It unanimously found Dr. Bruner did not commit malpractice causing the decedent's demise. By a vote of ten to two, the jury found Bard did not manufacture a defective graft which caused the decedent's death. A judgment in favor of the defendants and against the plaintiffs was signed on February 28, 1989. The trial court cast the plaintiffs for all costs. The judgment also taxed as costs the expert witness fees which the trial court had previously set in a written opinion dated February 15, 1989.
The plaintiffs' appeal. They assign as error the following: (1) the trial jury erred in finding Dr. Bruner did not commit malpractice upon the decedent; (2) the trial jury erred in finding that the graft was not defective; (3) the trial judge erred in not instructing the jury on the doctrine of res ipsa loquitur; and (4) the trial judge erred in not instructing the jury that a product which failed early in its life use is presumed to be defective.

MALPRACTICE
The plaintiffs contend the trial jury erred in failing to find that Dr. Bruner was negligent and committed malpractice during the resection surgical procedure.
LSA-R.S. 9:2794(A)(1) provides that where a defendant doctor practices in a particular speciality, then the plaintiffs have the burden of proving the degree of care ordinarily practiced by doctors within the involved medical specialty. (Section C of this article also provides that the plaintiff has the burden of proving the doctor's negligence by a preponderance of the evidence and that the jury shall be instructed that injury alone does not raise a presumption of negligence. However, it also provides these provisions shall not apply in situations where res ipsa loquitur is applied.)
*743 The record reveals that the graft was properly implanted. No leaks or defects were observed in the areas where the graft was connected to the aorta. Nor is there any showing that Dr. Bruner committed any error during surgery.
Careful examination of the record demonstrates that the plaintiffs failed to prove any negligence on the part of Dr. Bruner. As to the damage to the graft itself, plaintiffs presented no direct or circumstantial evidence to indicate that Dr. Bruner cut, nicked, tore, or burned the graft during surgery. Dr. Bruner testified that he was the only one who touched the graft and that he never made any longitudinal cuts (such as the one found in the graft). The only instruments that came into contact with the graft were clamps and scissors. The medical witnesses, including Dr. Shelby (who had extensive experience with such procedures), generally agreed that Dr. Bruner could not have closed the decedent's incision if the graft had been cut or if there had been a hole in it. Once the clamps were removed and blood circulation was restored, the arterial pressure would have caused blood to spurt out of any such holes. Additionally, Dr. Bruner testified, without contradiction, that he carefully checked the area around the graft for bleeding and that none was observed. He further testified that if the graft had been nicked, he would have noticed a "pinhole" in it.
Therefore, we find that the jury committed no error in finding Dr. Bruner free of negligence in the death of Mr. Watson.
This assignment of error is without merit.

DEFECTIVE GRAFT
The plaintiffs assert that the trial jury erred in not finding the Bard graft was defective. We find merit in this assignment of error.
We are faced with an unusually complicated case, but one in which a preponderance of evidence clearly reveals that the decedent's death was caused by the defective graft manufactured by Bard. The jury's verdict to the contrary was manifestly erroneous.
At trial, the plaintiffs contended that the graft failed or ruptured while in the decedent's body, thus leading to his death by massive hemmorhaging. To the contrary, the defendants asserted that the tear in the graft was put there after Mr. Watson died. The defendants contend that the graft was accidentally cut by Dr. McCormick during the autopsy. This charge was categorically denied by Dr. McCormick. At trial, the defendants contended that the decedent died either as a result of an infarction of the sigmoid colon, or because of the Coumadin therapy. At this point, we must consider, in some detail, the evidence presented at trial.
The doctors generally agreed that the sixty-five-year-old decedent was in poor health. He had severe cardiovascular disease. He had previously had two heart attacks and a stroke. At the time of his death, he had moderate to severe arterial sclerosis, as well as other maladies.
Dr. Smith began treating the decedent in 1982. He saw the decedent in the emergency room on December 17, 1983, where the decedent sought treatment for early signs of pneumonia. His hemoglobin count (the volume of blood in his body) was 16.0. (The evidence at trial indicates that the normal hemoglobin rate for an adult male was about 14.) On December 31, 1983, Dr. Smith admitted the decedent to the hospital. The decedent had been having black bowel movements, which were indicative of gastrointestinal bleeding. At admission, the decedent's hemoglobin was 10.5. By the time of his discharge on January 4, 1984, it had risen to 10.8. Dr. Smith concluded that the decedent's blood was too thin. He initially stopped the decedent's Coumadin treatment and then resumed it at a reduced dosage. Thereafter, Dr. Smith spoke to Mrs. Watson about the decedent suffering from left hip pain. However, Dr. Smith was unable to see the decedent at that time. He referred the decedent to Dr. Bailey for evaluation and treatment of the hip pain.
*744 On the day of the decedent's final collapse and death, Dr. Smith was called to the emergency room where he participated in the resuscitation efforts. He observed that the decedent's abdomen was markedly distended and tight. Given Mrs. Watson's description of the decedent's symptoms immediately prior to death (which were consistent with a sudden, massive bleeding to death), he suspected a rupture of the aorta. In his trial testimony, Dr. Smith discounted the possibility that the decedent might have died as a result of an infarction of the sigmoid colon or as a result of the Coumadin therapy. Had one of these been the cause of death, the decedent would have had bloody diarrhea or, in the case of Coumadin, he would have alternatively vomited blood.
Dr. Bailey, a general surgeon, had treated the decedent periodically since 1976. He examined the decedent on February 19, 1984, when he was seen in the emergency room for left flank pain which had gotten progressively worse over several days. Dr. Bailey felt the decedent was bleeding into his left hip joint due to the Coumadin therapy. His hemoglobin count was 10.7. However, no evidence of bleeding in the gastrointestinal tract was found. Dr. Bailey noted that the decedent's abdomen was soft, flat, and nontender. He also observed a good palpable pulse in the groin area which indicated that blood was going through the graft without any difficulty. Dr. Bailey also saw the decedent in his office on February 23, 1984, at which time he seemed better. However, later that day he received a call from the Watsons indicating that the decedent's hip pain had worsened. At this time Dr. Bailey suggested the decedent return to see Dr. Bruner.
Two days later, when the decedent collapsed at home, Dr. Bailey was summoned to the emergency room by Dr. Smith. When Dr. Bailey arrived at the emergency room, the decedent was already dead. He observed that the decedent's abdomen was "very distended" and was "the size of a nine month pregnancy." Dr. Bailey's impression was that the decedent's graft had "blown out" at one of the suture sites, leading to a sudden hemorrhage into the abdomen. For the same reasons given by Dr. Smith, Dr. Bailey specifically discounted the possibilities that the decedent might have died as a result of an infarction of the sigmoid colon or as a result of the Coumadin therapy.
Dr. Shelby performed the decedent's bypass surgery in 1982. He testified that the decedent's symptoms of severe back pain and collapse were consistent with a sudden, massive blood loss. He testified that the distention of the abdomen was consistent with a rupture of the aorta or a part thereof.
Dr. McCormick testified that when he opened the decedent's abdomen during the autopsy he discovered a large amount of bright red arterial blood from a recent hemorrhage. He estimated the quantity of blood to be between 1500 and 2000 cc's, or forty percent of the decedent's total circulating blood volume. Having discovered the decedent had obviously died as a result of a hemorrhage into the abdomen, Dr. McCormick then proceeded to search for the source of the blood. He testified that he was fully aware of the prior graft procedure. Therefore, Dr. McCormick proceeded with special caution because he realized the surgeon who performed the graft surgery might face accusations of negligence.
Dr. McCormick checked the graft suture sites, which he found to be intact. He then observed that a portion of the graft was elevated, being pushed upward by some material behind it. Using a pair of blunt scissors, he cut down the legs of the graft. He discovered a one-inch hole or tear in the right leg of the graft. He also discovered a cavity, or false aneurysm, behind the rupture site which contained old, clotted blood and tissue reaction. He testified that such cavities form as part of the body's efforts to contain hemorrhaging.
Dr. McCormick also found a substantial amount of blood around the sigmoid colon, which was only a few inches from the graft. Examination of the colon revealed that it was gangrenous and dying. He concluded that the sudden hemorrhage from the graft allowed blood to surround *745 the colon and cut off its blood supply long enough for the colon to become gangrenous. He found no evidence of a ruptured colon, and he testified that an infarction of the sigmoid colon was not possible. The colon was not sufficiently gangrenous to have ruptured. Furthermore, if a small artery in the sigmoid colon had ruptured, it would have bled over a longer period of time. Thus, the blood discovered in the abdomen would have been in various stages of clotting and of different colors.
Dr. McCormick also testified that the decedent could not have bled to death because of the Coumadin because of the rapidity of the final episode.
Dr. Bruner initially agreed with the other medical doctors that the decedent died from a sudden massive loss of blood. However, he testified at trial that he had changed his opinion earlier in the week after viewing Mr. Titone's photographs of the Bard graft. He then began to speculate that Dr. McCormick had cut the graft during the autopsy. Dr. Bruner then attempted to explain why Mr. Watson died, if there had been no rupture of the graft prior to his death.
He testified that the decedent could have died as a result of an infarction of the sigmoid colon. He testified that if the sigmoid colon was gangrenous, sufficient blood could have built up in the sigmoid mesentery for it to burst through the outer wall of the mesentery. Thus, the decedent was having a slow, gradual blood loss from the sigmoid mesentery. The left hip pain of which the decedent complained was "referred pain" from the sigmoid, which is part of the autonomic nervous system. Dr. Bruner explained the decedent's back pain, followed by his collapse, was caused by a loss of as little as 300 cc's of blood when the mesentery finally ruptured. He also testified that the Coumadin contributed to the decedent's gradual bleeding.
It is well-settled that a court of appeal may not set aside a trial jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978), on remand 370 So.2d 1262, writ denied 374 So.2d 660 (La. 1979); Rosell v. ESCO, 549 So.2d 840 (La.1989).
If findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; only the fact finder can be aware of the variations of demeanor and tone of voice that bear so heavily on the listener's understanding and the belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact-finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness, even in a finding purportedly based upon a credibility determination. Where such factors are not present, and a fact finder's finding is based on its decision to credit the testimony of one of two or more witnesses, the finding can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, supra.
Based on the overwhelming medical evidence, we must conclude that the jury was manifestly erroneous in rendering judgment against the plaintiffs and in favor of Bard. The evidence demonstrates that the decedent died from a sudden, catastrophic blood loss. With the exception of Dr. Bruner, the medical witnesses, including Dr. Shelby who was called by the defendants, testified that the decedent's symptomssudden back pain and loss of consciousnesswere completely compatible with such a conclusion. Furthermore, the majority of these experts agreed that the cause of death suggested by the defendants was not supported by the objective evidence.
Another important factor is the existence and position of the cavity discovered behind the rupture site of the graft. The objective evidence admitted at trial included photographs *746 of this cavity. The only plausible explanation for the existence of the cavity immediately behind the tear in the graft is that there was some bleeding from the graft at that site to which the decedent's body reacted and which it tried to contain. The only source of such bleeding had to have been the defective graft.
The defendants made much of the decedent's hemoglobin rates. However, these appear to be related to the difficulties in regulating the decedent's Coumadin therapy. Had the blood which was found in the decedent's abdomen been there as a result of the Coumadin, it would have been of differing color, and in different clotting stages, than the bright red, fresh blood discovered by Dr. McCormick. Also, the medical evidence shows that if there had already been substantial bleeding, Mr. Watson's abdomen would not have been soft and flat when Dr. Bailey examined him less than a week prior to his death.
At trial, Bard presented the testimony of two experts in implantable knit fabrics who both contended that the graft had been cut. However, the overwhelming evidence in this case shows that the defectiveness of the graft unquestionably caused the decedent's death. Furthermore, we note that Mr. Titone testified that while he did not feel a manufacturing defect caused the rupture, he could not say that the yarn or material was not defective. Nor had he performed any fiber or strength testing on the graft. We also observe that Mr. Titone did not photograph or examine the portion of the graft which Dr. McCormick admittedly cut during the autopsy with an eye toward comparing it to the "tear" found in the graft. Ms. Estakhrian testified that she had examined these two areas together and could detect no difference. However, we further note that her opinions became increasingly "refined" over time. In her deposition she testified that she could not say whether the defect in the graft occurred in the decedent's body or not. At trial she had "refined" her testimony to say that the graft did not fail in the decedent's body. Ms. Estakhrian further testified at trial that Bard's quality control program had a rejection rate of thirty percent of its grafts.
To recover in a product liability case the plaintiff must prove that the harm resulted from the condition of the product, that the condition made the product unreasonably dangerous to normal use and that the condition existed at the time the product left the manufacturer's control. The manufacturer is presumed to know the vices in the things he makes, whether or not he has actual knowledge of them, and once the product is proven defective by reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the manufacturer in its manufacturing or processing. Gines v. State Farm Fire and Casualty Company, 516 So.2d 1231 (La.App. 2d Cir. 1987), writ denied 519 So.2d 127 (La.1988).
In the present case, we find that the evidence presented demonstrates that the graft was implanted into the decedent in the same condition in which it was received from the manufacturer. (As previously noted, the parties stipulated that the graft was in the same condition when received by Nurse Neill as when it left the manufacturer.) The graft obviously failed when it was in normal use and was thus defective.
Therefore, inasmuch as the preponderance of the total evidence at trial demonstrates that the graft was defective and that the defectiveness led to the decedent's death, we find that Bard and its insurer Aetna are liable for the damages sustained as a result of its failure.
Due to our resolution of this assignment of error, we pretermit consideration of the remaining two assignments of error.

QUANTUM
Inasmuch as we render judgment in favor of the plaintiffs against Bard and its insurer, we must now determine the amount of damages to which the plaintiffs are entitled.

Survival Action
The elements of damage in a survival action are pain and suffering, loss of *747 earnings and other damages sustained by the victim up to the moment of death. Pierre v. Lallie Kemp Charity Hospital, 515 So.2d 614 (La.App. 1st Cir. 1987), writ denied 515 So.2d 1111 (La.1987). In the present case, the decedent suffered severe back pain and discomfort before lapsing into unconsciousness. We award the sum of $2,500 for his pain and suffering. This amount will be divided equally between Mrs. Watson and Ms. Bruce.

Wrongful Death
The elements of damage of wrongful death are loss of love and affection, loss of services, loss of support, medical expenses and funeral expenses. Pierre, supra.
The testimony of expert economist Dr. Melvin W. Harju established that the sixty-five-year-old decedent had a work life expectancy of 4.1 years. Although his health was not good, the record established the decedent recovered "remarkably well" from his past maladies and that he was a hard working employee. His annual salary was $28,600, and he received bonuses regularly. His last bonus was $2,500. Thus, his annual income was $31,100. Therefore, based upon his work life expectancy, and utilizing the appropriate discounts for personal consumption, we award damages for lost future wages of $100,834.00. We also award recovery of the expenses Mrs. Watson incurred for the ambulance service, emergency room services and the funeral, in the total amount of $3,546.74. Therefore, for special damages, Mrs. Watson is entitled to the following awards:

Lost Future Wages $100,834.00
Ambulance Service 335.00
Emergency Room Services 613.90
Funeral Expenses 2,597.84
 ___________
 Total................... $104,380.74

We also award damages to Mrs. Watson, who was fifty-five years old at the time of trial, for the loss of her husband and his love and affection. They married in 1977, both having previously been married. They worked together both before and after their marriage. They traveled together, attending bowling conventions and taking family vacations. They also enjoyed such activities as attending church and shows together, as well as fishing. They had a close and loving relationship. For her loss of her husband's love and affection, we award Mrs. Watson the sum of $100,000.
Additionally, we award damages to the decedent's daughter, Ms. Bruce, for the loss of her father's love and affection. The record reveals that the father and daughter also enjoyed a close and loving relationship. They spoke on the telephone several times each week. Although Ms. Bruce lived in Lubbock, Texas, she and her two daughters visited her father and his second wife on numerous occasions, including major holidays. We award to Ms. Bruce general damages of $35,000 for the loss of her father's love and affection.

CONCLUSION
The judgment of the trial court is affirmed as to Dr. Bruner. However, the judgment is reversed as to Bard and its insurer, Aetna. Judgment is rendered as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of the plaintiff, Wilma Joy Watson Bruce, and against the defendants, C.R. Bard, Inc., and Aetna Life and Casualty Company, in solido, in the full sum of $36,250 plus interest thereon at the legal rate, from the date of judicial demand, until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of the plaintiff, Shirley Louise Wallace Watson, and against the defendants, C.R. Bard, Inc., and Aetna Life and Casualty Company, in solido, in the full sum of $205,630.74, plus interest thereon at the legal rate, from the date of judicial demand, until paid.
All costs of these proceedings are assessed against the defendants, C.R. Bard, Inc. and Aetna Casualty and Surety Company.
AFFIRMED IN PART, REVERSED IN PART AND RENDERED.

*748 ON APPLICATION FOR REHEARING
Before FRED W. JONES, Jr., NORRIS, LINDSAY, SEXTON and HIGHTOWER, JJ.
Rehearing denied.
NOTES
[1] The measurement of 20 millimeter designated the diameter of the upper portion of the graft. A bifurcated graft has two descending legs which are sutured to the two iliac arteries, which diverge from the bottom of the aorta.