722 So.2d 433 (1998)
Rhonda Renee HOLT, et al., Plaintiffs-Appellees,
v.
CANNON EXPRESS CORPORATION, et al., Defendants-Appellants.
No. 31,271-CA.
Court of Appeal of Louisiana, Second Circuit.
December 11, 1998.
*435 Lunn, Irion, Johnson, Salley & Carlisle by Jack E. Carlisle, Jr., Shreveport, Counsel for Appellants Vanliner Ins. Co., Cannon Express Corp. and Bobby Ramsey.
Ronald V. McKneely, and Tom N. Thompson, and John Turnage, Shreveport, Counsel for Appellees.
Before BROWN, WILLIAMS and PEATROSS, JJ.
*436 BROWN, Judge.
This appeal arises out of an accident involving a motorcycle and a tractor-trailer rig that occurred on December 3, 1991. Driving an 18-wheeled tractor-trailer rig northbound on La. Highway 173 ("ShreveportBlanchard Highway"), Bobby Ramsey started a left-hand turn onto Industry Road in front of Billy J. Holt, who was riding a Harley-Davidson motorcycle southbound on Hwy. 173. Ramsey testified that he never saw the motorcyclist. There were 50 feet of skid marks laid down in a straight line in the middle of the motorcyclist's lane of travel to the point of impact with the right front tire of the tractor. Holt was killed in the accident. Holt's surviving spouse and daughter, Rhonda Renee Holt and Tina Annette Holt Perkins, filed suit against Ramsey, his employer, Cannon Express Corporation, and their insurer, Vanliner Insurance Company, seeking wrongful death and survival damages.
The matter was tried by a jury. The jury found that both Ramsey and Holt were negligent and assessed Holt with 71% of the fault. The jury's damage award was reduced by the fault attributed to Holt.
Following entry of judgment in accordance with the jury's verdict, plaintiffs filed a motion for JNOV, urging error in the jury's assessment of fault and damages. The trial court denied JNOV as to the jury's apportionment of fault, but granted partial JNOV and increased plaintiffs' damage awards.
Defendants have appealed and plaintiffs have answered the appeal, both urging error in the assessment of fault and damages. We find clear error in the apportionment of fault and amend in part the damage award.

Discussion

Fault
A JNOV is the procedural device authorized by La.C.C.P. art. 1811 whereby the trial court may correct a legally erroneous verdict by modifying fault or damages or both, that the jury may have assessed. Jackson v. A.L. & W. Moore Trucking, 609 So.2d 1064 (La.App. 2d Cir.1992). The JNOV questions whether the jury verdict, as a matter of law, is supported by any legitimate or substantial evidence. To find that the evidence was insufficient as a matter of law requires that there be no valid line of reasoning or permissible inferences which could lead rational men and women to the conclusion reached by the jury. United Group of National Paper Distributors, Inc. v. Vinson, 27,739 (La.App.2d Cir.01/25/96), 666 So.2d 1338, writ denied, 96-0714 (La.09/27/96), 679 So.2d 1358; Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2d Cir.1991).
In reviewing the grant or denial of JNOV, the appellate court must determine whether the trial court committed manifest error or was clearly wrong in granting or denying the motion. Morehead v. Ford Motor Company, 29,399 (La.App.2d Cir.05/21/97), 694 So.2d 650, writ denied, 97-1865 (La.11/07/97), 703 So.2d 1265; Gibson, supra.
In denying JNOV as to the jury's determination and apportionment of fault, the trial court found that there was evidence from which a reasonable jury could have rendered a verdict allocating fault in the percentages set by the jury in this case. We will therefore review the evidence to determine whether the trial court's ruling upholding the jury's verdict was manifestly erroneous or clearly wrong.
Bobby Ramsey, a long haul truck driver employed by Cannon Express, testified that on the evening before the accident, he and his wife spent the night at the Petro Truck Stop in Shreveport. Waking up around 5:45 a.m. the next day, Ramsey, with his wife as passenger, left the truck stop at approximately 6:00 a.m. going to International Paper, which is located on Industry Road in Blanchard, to pick up a load of paper rolls. Because it was dark outside, Ramsey turned on his headlights.
Ramsey's route took him from I-20 to the I-220 loop to the Shreveport-Blanchard Highway. Ramsey noted that traffic was light to moderate as he neared Industry Road. Ramsey estimated his speed to be between 10-15 m.p.h. as he approached the intersection. He engaged his left turn signal *437 approximately 100-150 feet south of Industry Road and, without coming to a complete stop, began his left turn. Ramsey stated that he saw two headlights from a southbound vehicle, but because he estimated the vehicle's distance to be 800-1000 feet north of the intersection, he felt that he had adequate time to complete his turn. Ramsey checked his mirrors to make sure that no one was attempting to pass him and to confirm that the trailer was going to clear. According to Ramsey, his truck was traveling 3-5 m.p.h. as he began turning. Approximately 25-30 feet into the turn, he heard a "roar and wham" which is apparently when Holt's motorcycle hit the truck. Ramsey testified that he never saw Holt and that he didn't even know what had hit him until he got out of his rig. Ramsey stated that Holt's point of impact was in the area of the tractor's right front tire.[1]
Timothy Brogden was northbound on La. Hwy. 173 on the morning of the accident. Brogden was employed at International Paper on Industry Road. To get to work in the mornings, Brogden testified that he usually drove north on Shreveport-Blanchard Highway and made a left turn at its T-intersection with Industry Road. On December 3, 1991, Brogden was on day shift, so he had to be at work at 7:00 a.m. Brogden stated that he was behind Ramsey's 18-wheeler and another vehicle. As he approached the intersection with Industry Road, Brogden was coming out of a curve and had a clear view of the straightaway in front of Ramsey's tractor-trailer rig. According to Brogden, before the 18-wheeler started its left turn, he observed one headlight on what appeared to be a motorcycle in the southbound lane of Shreveport-Blanchard Highway. When he saw the big truck begin its turn in front of the headlight, Brogden testified that he knew there was going to be a wreck.
On cross-examination, Brogden stated that he did not see the motorcycle pass another vehicle and does not recall seeing the van driven by another witness, Dixie Hayes. Brogden further noted that the motorcycle was in the middle of its lane of travel.
Sgt. Loren Ward of the Blanchard Police Department and Deputy Johnny Davis of the Caddo Parish Sheriff's Office responded to the accident. Both officers noted that the right front tire of the tractor was flat and that there was damage to the right front fender, diesel tank and stack. Both stated that they observed no damage to the trailer, which had not crossed over into the southbound lane. Sgt. Ward and Deputy Davis also confirmed that there was a skid mark 50 feet long in the southbound lane leading up to the point of impact.
Gene Moody testified as plaintiffs' expert in accident reconstruction. Moody examined the accident scene and took photographs and measurements of the site and the damaged motorcycle. He also looked at time and distance relationships of the vehicles involved in the accident and made calculations to determine speed before and at the time of the collision. Moody stated that looking north from the intersection, because the road is straight, there are no sight obstructions for at least 1,000 feet up La. Hwy. 173. The posted speed limit for that portion of the highway is 55 m.p.h. When asked about the curve and no passing zone mentioned by Mrs. Hayes, Moody noted that this area was further north of the intersection.
Moody noted that only the tractor sustained damage; there was no damage to the trailer other than possible fire damage. The tractor's right front wheel was damaged and the right front tire was flat. Thus, he concluded that Holt's motorcycle hit the truck in the area of the right front wheel. Also, given the long skid marks in the motorcycle's lane, the collision clearly occurred in the southbound lane of travel.
In calculating the speed of the collision and how it occurred, Moody examined and took measurements of the damaged motorcycle. He first determined that the motorcycle had disc brakes and that Holt was considered a professional driver. He noted that the skid marks left by Holt's front and back tire were the same, which indicates that Holt did a very good job in applying his brakes. Also, *438 because the skid marks were straight, Moody concluded that Holt's motorcycle was traveling in a straight path when Holt saw Ramsey begin his left turn.
As measured by the responding officers, the skid marks were 50 feet from the point of impact. Moody calculated Holt's braking time to be 9/10 of a second at 50 feet from the intersection. According to Moody, Holt skidded down from a speed of 45 m.p.h. to 30 m.p.h., which was his speed at the time of impact. Moody calculated Holt's time of perception to be 1.9 seconds at a distance of 66 feet from the intersection. Upon perceiving the danger of Ramsey's left-turning tractor trailer6 rig, Holt traveled forward 16 feet, which took him one second, before he responded by locking up his brakes and skidding for 50 feet to the point of impact.
Moody noted that the intersection was a "T" and that traffic on Industry Road had a stop sign. Ramsey, who was turning left from Shreveport-Blanchard Highway onto Industry Road, had the duty to observe and yield to oncoming traffic. Moody estimated that Ramsey's truck had a turning speed of 10 m.p.h. and traveled only 34 feet from the beginning of its turn to the point of impact. Moody was adamant that Holt was in his own lane heading south when Ramsey began his left turn. Moody noted that there was no evidence from which he could calculate the point where Holt passed Mrs. Hayes. Moody did note, however that if the motorcycle had just been getting back into its own lane after passing, the skid marks would not have been straight.
In support of their theory that the accident was caused solely by the fault of Holt, defendants presented the testimony of Dixie Hayes. On the morning of December 3, 1991, Mrs. Hayes, a schoolteacher at Benton Elementary School, and her nieces were on their way to Benton from their home in Blanchard. Mrs. Hayes testified that she left her home at the normal time, around 6:30 a.m., and headed south on La. Hwy. 173. Mrs. Hayes stated that Holt passed her "almost every morning." While noting that the posted speed limit was 55 m.p.h., Mrs. Hayes stated that she typically operated her vehicle at 50 m.p.h.
As Mrs. Hayes was traveling southbound, she observed Ramsey's tractor-trailer rig as it was beginning its left turn, approximately 400 feet south of her van. According to Mrs. Hayes, as she was decelerating her own van in response to Ramsey's left-turning maneuver, she heard the roar of a motorcycle and observed Holt passing on her lefthand side and remarked to her nieces, "My God, he's fixing to hit that truck." Mrs. Hayes noted that she was able to stop her van approximately 60 feet from the accident site.
On cross-examination, Mrs. Hayes noted that she knew Holt was behind her before he passed her because she saw his headlight in the rearview mirror. While Holt usually passed her right outside of Blanchard, traffic was heavy on the morning of the accident, so he was unable to get around her van. According to Mrs. Hayes, when Holt, traveling in excess of the speed limit, was finally able to pass, it was in a clearly marked "no passing" zone.
In a pre-trial deposition, Mrs. Hayes stated that the impact occurred in the northbound lane and that Holt did not make it back into his own lane after passing her. At trial, however, she testified that it appeared as if the collision occurred in the middle of the road. Mrs. Hayes emphasized, however, that the accident had happened more than five years before the trial and acknowledged that because of the location of the skid marks, the impact must have occurred in Holt's southbound lane. Mrs. Hayes noted that she had never before witnessed a fatal collision and stated that she and her nieces were unnerved and very shaken afterwards.
Ray Herd testified as defendants' expert in accident reconstruction. Although he made a site examination and reviewed the accident and investigative reports, he mainly based his opinion on the testimony of Dixie Hayes.
Herd first noted that the no passing zone begins approximately 730 feet north of the intersection. Mrs. Hayes estimated her van to be 200-300 feet north of the intersection when Holt passed her and approximated her speed to be 50-55 m.p.h. Herd opined that Holt began his passing maneuver when he was 670 feet from the intersection and traveling *439 at a speed of 65-70 m.p.h. According to Herd, the accident was caused by Holt crossing the double yellow line to pass Mrs. Hayes. Herd emphasized that Mrs. Hayes had no difficulty stopping her own vehicle for Ramsey's left-turning 18-wheeler.
On cross-examination, Herd admitted that there was no physical evidence to support his theory and noted that the sole basis for his conclusion was Mrs. Hayes' account of the accident. Herd also acknowledged that the accident took place in the southbound lane of travel and noted that Holt's motorcycle left 50 feet of skid marks in his own lane. He further conceded that Holt's initial impact with Ramsey's rig was in the right front wheel area.
A left turn is one of the most dangerous maneuvers a motorist may execute and requires the exercise of great caution. Before attempting a left turn, a motorist should ascertain whether it can be completed safely. Theriot v. Lasseigne, 93-2661 (La.07/05/94), 640 So.2d 1305; Silva v. Calk, 30,085 (La. App.2d Cir.12/10/97), 708 So.2d 418.
In a vehicular collision case, plaintiffs are afforded the benefit of a presumption of the defendant's negligence when they prove that the defendant executed a left hand turn and crossed the center line at the time of the impact. Miller v. Leonard, 588 So.2d 79 (La.1991). The burden rests heavily on the motorist who desires to make a left turn to explain how the accident occurred and to show that he is free from negligence. Id.; Silva, supra.
Likewise, jurisprudence has established that an oncoming driver has a right to assume that the left-turning motorist will obey the law in allowing him to continue in his proper lane of travel and will yield to his right-of-way. Jones v. Lingenfelder, 537 So.2d 1275 (La.App. 2d Cir.1989), writ denied, 539 So.2d 631 (La.1989); Terro v. Casualty Reciprocal Exchange, 93-593 (La.App. 3d Cir.02/02/94), 631 So.2d 651, writ denied, 94-0522 (La.04/22/94), 637 So.2d 157.
Nonetheless, all motorists on Louisiana highways must drive with due regard for the traffic on the highway and have an affirmative duty not to drive faster than is reasonable and prudent under the conditions and potential hazards existing at the time. La. R.S. 32:64(A); Lennard v. State Farm Mutual Automobile Insurance Company, 26,396 (La.App.2d Cir.01/25/95), 649 So.2d 1114; Jones, supra. Thus, notwithstanding the presumption of negligence attributed to a left-turning driver, a favored motorist can still be assessed with comparative fault if his substandard conduct contributed to the cause of the accident. Terro, supra.
Ramsey was executing a left turn in his tractor-trailer rig when he was struck by Holt. It was uncontradicted that Ramsey had crossed the center line and that the impact occurred in Holt's lane of travel. In fact, upon perceiving that Ramsey intended to turn left in front of him, Holt tried to avoid an accident by braking. His brakes locked up and he left 50 feet of skid marks in his own lane. As noted above, it was conclusively established that the point of impact between Holt's motorcycle and the 18-wheeler was in the area of the tractor's right front tire, which shows that Ramsey did not have adequate time in which to safely complete his turning maneuver. Even Mrs. Hayes had to decelerate when she saw Ramsey begin to turn. That Ramsey did not see Holt is evidence that he started his left-hand turn without insuring that it was safe to do so.
There was, however, evidence from which the jury could have concluded that Holt passed Mrs. Hayes in a no passing zone, and after returning to his lane of travel, was unable to avoid the collision with Ramsey. As the physical evidence at the scene and Brogden's testimony demonstrated, Holt had returned to the southbound lane when Ramsey started his turn. Considering the evidence and the reasonable inferences to be made therefrom, we find that the trial court committed manifest error in denying plaintiffs' motion for JNOV concerning fault. We conclude that the highest percentage of fault that the jury could have reasonably allocated to Holt was 10% and that 90% should have been assessed to Ramsey. We will amend the judgment accordingly.

*440 Damages

The elements of damage for a wrongful death action are loss of love and affection, loss of services, loss of support, medical expenses and funeral expenses. Gordon v. Willis Knighton Medical Center, 27,044 (La.App.2d Cir.06/21/95), 661 So.2d 991, writ denied, 95-2776 (La.01/26/96), 666 So.2d 679; Cannon v. Cavalier Corp., 572 So.2d 299 (La.App. 2d Cir.1990); Watson v. C.R. Bard, Inc., 557 So.2d 739 (La.App. 2d Cir.1990), writ denied, 563 So.2d 880 (La. 1990).
The discretion to award general damages vested in the trier of fact is vast. Only when the award is "in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances" should an appellate court increase or reduce the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260-61 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
The jury made the following awards to plaintiffs:

Tina Annette Holt Perkins
Loss of love, companionship and affection: $3,500
Past loss of services: 960
Future loss of services: 0
 ______
 $4,460
Rhonda Renee Holt
Past loss of support: $70,000
Past loss of fringe benefits: 10,000
Past loss of services: 25,000
Future loss of support: 275,000
Future loss of services: 20,000
Loss of love, affection, companionship
and grief: 0
Pre-impact fear of Holt: 0
Funeral expenses: 0
Property damage: 0
 _______
 $400,000

The jury made no award to Renee Holt for her loss of love, companionship, affection and grief, and awarded Tina Perkins only $3,500. In granting JNOV, the trial court awarded Renee $200,000 and increased Tina's award to $25,000. In addition, the trial court awarded Renee $5,000 for Holt's pre-impact fear, $6,825.24 for funeral expenses and $5,685 in property damages.

Loss of Love and Affection
Plaintiffs assert that the trial court should have awarded at least $300,000 to Renee and a minimum of $125,000 to Tina. On the other hand, defendants, apparently conceding the propriety of the trial court's JNOV award to Renee, argue that $200,000 is excessive.
Once a trial court has determined that a JNOV is warranted because reasonable men could not differ on the fact that a particular award was either abusively high or low, it must then determine what is the proper amount of damages to be awarded. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La.1991); Sumrall v. Sumrall, 612 So.2d 1010 (La.App. 2d Cir. 1993). In making this determination, the trial court is not constrained as the appellate courts are to raising (or lowering) the award to the lowest (or highest) point which is reasonably within the discretion afforded that court. Anderson, supra; Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976).
In reviewing a trial court's grant of JNOV as to damages, an appellate court, after first determining that the JNOV was properly granted, i.e. that reasonable men must find that the jury award was an abuse of discretion, must then examine the trial court's award of damages under the appellate constraints of Coco, supra. See Anderson, supra; Wilson v. National Union Fire Insurance Co. of Louisiana, 27,702 (La.App.2d Cir.12/06/95), 665 So.2d 1252.
Noting evidence of a close and loving relationship between Billy and Renee Holt, the trial court awarded Renee $200,000 for her loss of love, companionship, affection and grief. We have reviewed the record and find this award to be neither abusively high nor abusively low and therefore not an abuse of the trial court's vast discretion.
As for Tina Holt Perkins, the trial court noted that she was an adult child who had lived with her father for only a short period of time after her parents divorced. Nonetheless, the court found evidence of a substantial relationship between Billy Holt and his daughter Tina and awarded her $25,000 for loss of love, affection and companionship. *441 The evidence clearly showed that Tina and her father were very close and shared a special relationship. Holt performed special services around the house for Tina. In fact, the jury awarded Tina damages for these services. We find the award to be abusively low and find that the lowest amount that could have been awarded under these circumstances would be $50,000. We will amend the judgment to reflect this amount.

Loss of Support and Services
Regarding the damages awarded to Renee Holt, defendants challenge as excessive the jury's awards of $70,000 for past loss of support; $275,000 for future loss of support; $10,000 for past loss of fringe benefits; and $25,000 for past loss of services.
Dr. Lavonia Casperson, plaintiffs' expert, was the only economist to testify concerning these elements of damages. Regarding past loss of support, Dr. Casperson calculated that as of trial, Billy Holt's lost wages amounted to $60,071. We agree with defendants that this is the highest amount that the jury could have reasonably awarded to Renee Holt for past loss of support and will amend the judgment accordingly.
As to future loss of support, Dr. Casperson provided the jury with several, figures, ranging from $218,126 to $428,578. We cannot say that the jury's award of $275,000 is an abuse of its vast discretion.
Dr. Casperson calculated Billy Holt's past loss of fringe benefits to be $9,671. The jury's award of $10,000 is not abusively high and will not be disturbed.
In addition to Dr. Casperson's estimate that as of trial, Renee Holt's loss of household services was $24,111, the record contains the testimony of Renee and her parents regarding the time Billy Holt spent each week performing house and yard work. The jury's award of $25,000 is not unreasonable and will be affirmed.
The jury awarded Tina Perkins $960 for past loss of services and declined to make an award for future loss of services. Plaintiffs contend that the trial court erred in failing to award Tina $32,232 for past and future loss of services.[2] Tina testified at trial that since her father's death, she has gotten married and that she and her husband were in the process of buying a home together. Apparently concluding that Tina would rely upon her husband for the things that her father used to help her with, the jury (and the trial court) declined to make an award for future loss of services. We find no manifest error in the trial court's denial of JNOV on this issue, as the evidence was such that reasonable men could disagree as to whether an award of $960 for loss of services was abusively low.

Conclusion
For the foregoing reasons, the judgment of the trial court denying JNOV as to fault is reversed. The judgment is amended to increase the amount of fault assessed against defendants from 29% to 90% and decrease the amount of fault assessed against plaintiffs' decedent from 71% to 10%. We also amend the judgment to reduce the jury's award to plaintiff, Renee Holt, for past loss of services from $70,000 to $60,071. Finally, we amend the judgment to increase the award to plaintiff, Tina Holt Perkins, for loss of love, affection and companionship from $25,000 to $50,000. In all other respects, the judgment of the trial court is affirmed. Costs of this appeal are assessed to defendants.
REVERSED IN PART; AMENDED IN PART; AND AS AMENDED AFFIRMED.
NOTES
[1] The deposition of Mrs. Ramsey, who passed away prior to trial, was entered into evidence and basically confirms the testimony of her husband.
[2] Dr. Casperson calculated that Tina's past and future loss of household and personal services was $32,232.