760 So.2d 478 (2000)
Carole S. FORD
v.
STATE of Louisiana Through the DOTD, et al.
No. 99-1297.
Court of Appeal of Louisiana, Third Circuit.
April 12, 2000.
Rehearing Denied May 24, 2000.
*481 Victoria R. Murry, Assistant Attorney General, Alexandria, Louisiana, Attorney for Defendant/Appellant, State of Louisiana, Department of Transportation and Development.
DeWitt t. Methvin, Jr., Gist, Methvin & Hughes, Alexandria, Louisiana, Attorney for Defendants/Appellants, State Farm Mutual Automobile Insurance Company *482 and State Farm Fire and Casualty Company.
Howard N. Nugent, Jr., Attorney At Law, Alexandria, Louisiana, Attorney for Plaintiff/Appellee, Carole Ford.
(Court composed of HENRY L. YELVERTON, BILLIE COLOMBARO WOODARD and GLENN B. GREMILLION, Judges).
YELVERTON, Judge.
Carole Ford was injured in an accident on June 30, 1996, when the Nissan Pathfinder in which she was a passenger was run off Hot Wells Road by an oncoming pickup truck driven by an unknown person. The Pathfinder hit a tree in the highway right-of-way. Ford filed suit against the State of Louisiana, Department of Transportation and Development (DOTD). She also sued the uninsured/underinsured (UM) insurer of the car in which she was riding, State Farm Mutual Automobile Insurance Company, as well as her umbrella insurance carrier, State Farm Fire and Casualty Company (the State Farm Defendants will be referred to collectively as State Farm). State Farm filed a cross-claim against the DOTD based on subrogation.
A jury found the unknown driver 100% at fault and awarded damages. Both Ford and State Farm filed motions for judgment notwithstanding the verdict (JNOV). The trial court granted the motions and rendered judgment assessing the DOTD with 10% of the fault and the unknown driver with 90% of the fault. The JNOV increased the overall damages awarded to Ford from $128,136.27 to $825,932.27. The trial court denied State Farm's claim based on subrogation. Both the DOTD and State Farm appealed the JNOV, and State Farm appealed the subrogation ruling. Ford answered the appeal and asked generally for an increase in damages.

FACTS
On June 30, 1996, four generations of Scheffers were in a Nissan Pathfinder on their way home from a family outing. The eldest, seventy-five-year-old Marie Scheffer, was the front seat passenger. She was killed. She was the owner of the Pathfinder. Her daughter, Carole Ford, the Plaintiff in this suit, was in the backseat behind her mother. Carole was seriously injured. Carole's daughter, Susan Fiser, was the driver. Fiser's eight-year-old daughter, Morgan, sat behind her mother in the backseat.[1] The group were headed back to Alexandria on Hot Wells Road, a state highway. As they approached a left curve, an orange-and-white pickup truck heading in the opposite direction came around the curve in the lane occupied by the Pathfinder. Trying to avoid a head-on collision with the truck, Fiser went off the road onto the dirt shoulder, lost control, and hit a large tree. The details of the accident were confirmed by an eyewitness, Clint Albares, who was a passenger in a vehicle right behind the Pathfinder. He saw the truck in the Pathfinder's lane of travel. The truck's driver was never identified.

THE ISSUES
The DOTD claims a JNOV should not have been rendered assessing it with fault and increasing the damage awards. State Farm supports the JNOV as to fault but argues that more fault should have been assessed to the DOTD. With one exception, State Farm complains also about the increase in the award of damages. State Farm additionally claims the trial court erred in dismissing its cross-claims against the DOTD. Ford asks for more damages.

JUDGMENT NOTWITHSTANDING THE VERDICT
A JNOV is a procedural device authorized by La.Code Civ.P. art. 1811 to correct a jury verdict. The standard for granting a JNOV, as well as the standard *483 for appellate review of a JNOV, have been developed jurisprudentially and are found in Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 832 (La.1991) (citation omitted):
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated.
A JNOV may be granted on the issue of liability, damages, or both. Article 1811(F). The first circuit further expounded on the appellate court's function in reviewing a trial court's decision to grant a JNOV in Smith v. Davill Petroleum Co., Inc., 97-1596, pp. 4-5 (La.App. 1 Cir. 12/9/98); 744 So.2d 23, 27 (citations omitted):
In general, the standard of review of a JNOV on appeal is twofold. First, we must determine whether the jury verdict is supported by competent evidence and is not wholly unreasonable. To make this determination, we must, after considering all of the evidence in the light most favorable to the party opposing the motion, find that it points so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict on the issue. Second, after determining that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review.
Likewise, when a trial court grants a JNOV as to quantum, both the decision to grant the JNOV (i.e. that facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict) and the resulting increase or decrease in the award must be reviewed. Once we have established that the trial court correctly applied its standard of review in setting aside the jury's damage award, we in turn review the trial court award under the manifest error standard of review. If there is manifest error in the trial court award, the jury's damage award should be reinstated. If the award is not manifestly erroneous, then the trial court damage award based on its independent assessment of the damages is reviewed on appeal under the constraints of Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), i.e., the abuse of discretion standard of review.
The abuse of discretion standard of review requires an inquiry as to whether the award for the particular injuries and their effects on the particular plaintiff under the particular circumstances is a *484 clear abuse of the much discretion of the trier of fact. Only after such a determination of an abuse of discretion is made, should we resort to prior awards for the purpose of determining the highest or lowest point which is reasonably within that discretion.

a. Allocation of Fault
Both the DOTD and State Farm complain about the trial court's allocation of fault of 90% to the unknown driver and 10% to the DOTD. The DOTD claims that it should have no fault, as found by the jury, and State Farm argues that the trial court should have assessed the DOTD with more fault, suggesting 85%. Therefore, we will review the assessment of fault to the DOTD according to the JNOV standards as outlined above.
Whether the claim against the DOTD is based on a theory of negligence pursuant to La.Civ.Code art. 2315, or a theory of strict liability pursuant to La. Civ.Code art. 2317, the plaintiff must prove that:
(1) the DOTD had custody of the thing which caused plaintiffs' damages, (2) the thing was defective because it had a condition which created an unreasonable risk of harm, (3) the DOTD had actual or constructive notice of the defect and failed to take corrective measures within a reasonable time, and (4) the defect was a cause-in-fact of plaintiffs' injuries.
Cannier v. Comeaux, 98-2378, pp. 5-6 (La.7/7/99); 748 So.2d 1123, 1127; Netecke v. State ex rel. DOTD, 98-1182, 98-1197 (La.10/19/99); 747 So.2d 489.
DOTD's duty is to maintain the public roadways in a condition that is reasonably safe and does not present an unreasonable risk of harm to the motoring public exercising ordinary care and reasonable prudence. La.R.S. 48:21(A). DOTD must maintain the shoulders and the area off the shoulders, within its right-of-way, in such a condition that they do not present an unreasonable risk of harm to motorists using the adjacent roadway and to others, such as pedestrians, who are using the area in a reasonably prudent manner. DOTD's duty to maintain safe shoulders encompasses the foreseeable risk that for any number of reasons a motorist might find himself on, or partially on, the shoulder. This duty extends not only to prudent and attentive drivers, but also to motorists who are slightly exceeding the speed limit or momentarily inattentive.
This duty, however, does not render DOTD the guarantor for the safety of all the motoring public. Further, DOTD is not the insurer for all injuries or damages resulting from any risk posed by obstructions on or defects in the roadway or its appurtenances. Moreover, not every imperfection or irregularity will give rise to liability, but only a condition that could reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances. The existence of an unreasonable risk of harm may not be inferred solely from the fact that an accident occurred. Whether DOTD breached its duty to the public, by knowingly maintaining a defective or unreasonably dangerous roadway, depends on all the facts and circumstances determined on a case by case basis.
Netecke, 98-1182, 98-1197 at pp. 7-9; 747 So.2d at 494-95 (citations omitted).
This stretch of Hot Wells Road contains an S-shaped curve. On the south side of the curve driving east, there was a grove of trees. There is no dispute that the tree impacted by the Pathfinder was located in the DOTD's right-of-way and only ten feet from the paved edge of the highway. The DOTD does not dispute custody of the tree.
This is not the first accident to have occurred at this curve. Ford herself was involved in an accident at this very same curve nine years earlier in 1987. That accident resulted in a lawsuit against the DOTD. Ford explained that the same *485 group of trees which was encountered in the present accident appeared to jump out at her during that earlier, nighttime accident which caused her to run off the road on the opposite side. The vehicle did not hit the trees that time.
There were three other accidents at this site. They happened in 1979 and 1980 and resulted in a total of five fatalities. In all three of the fatal accidents a vehicle hit a tree in the same small grove. In these three accidents, speed and alcohol figured as elements of causation.
The present case involved no speeding and no alcohol. Fiser had to leave the roadway to avoid a head-on collision. The tree impacted by the Pathfinder was only ten feet off the highway. John Mounce, an expert retained by the DOTD, admitted that it was questionable whether this horizontal clearance of ten feet met ASHTO standards and only met minimum DOTD standards. Mounce also agreed that these trees served no useful purpose.
Given this evidence we agree with the trial court that reasonable minds could not have concluded otherwise than that the DOTD had a responsibility to remove these trees. Located within ten feet of the curve, they presented an unreasonable risk of harm. The DOTD was aware of the risk, given that there had been three earlier accidents where vehicles left the road and hit the trees. The cost of removing these few trees was relatively negligible. They were removed after this accident.
However, we find that the trial court's assessment of only 10% fault to the DOTD was clearly wrong. "In apportioning fault the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed." Campbell v. Department of Transp. & Dev., 94-1052, p. 7 (La.1/17/95); 648 So.2d 898, 902 (citing Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 974 (La.1985)).
In Campbell, the supreme court found that the failure of the DOTD to install guardrails on a bridge was a cause-in-fact of the accident which resulted in the death of a passenger after the driver of the automobile fell asleep and veered onto the shoulder and the automobile stuck the bridge abutment on the opposite side of the road. In finding fault with the DOTD the supreme court held that even though the lack of guardrails did not cause the driver to lose control of his vehicle, the negligence of the driver as well as the failure of the DOTD to place guardrails on the bridge combined to cause harm to the guest passengers in the vehicle, and the DOTD's conduct was a substantial factor in causing the injuries. The supreme court found that the trial court was not clearly wrong in her allocation of fault of 75% to the DOTD. Just as in Campbell, in the present case the truck's driver set the accident in motion, but the trees in the DOTD's right-of-way were the direct cause of the injuries suffered by Ford.
"After a court of appeal finds a `clearly wrong' apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's decision." Clement v. Frey, 95-1119, pp. 7-8 (La.1/16/96); 666 So.2d 607, 611. The supreme court has provided some factors to guide us in determining what is the lowest percentage of fault we can assess to the DOTD in raising the amount awarded by the trial court.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, *486 without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Watson, 469 So.2d at 974.
The trees were very close to the highway. If a vehicle had to go off the road at that curve for whatever reason, there was a foreseeable risk that it would hit the trees. The presence of the trees in the right-of-way in the curve presented an unreasonable risk of harm and was a direct result of the injuries to Ford. We find that the lowest percentage of fault that we can assess to the DOTD is 35%.

b. Damages
Both the DOTD and State Farm argue that the JNOV increase in damages was excessive. The verdict sheet listed twelve damage items for the jury to fill in. The jury entered zeroes for seven items. In the JNOV, the trial judge rendered awards for each of those zero items, concluding that reasonable minds could not disagree that some award was due. Below, we have listed those items as they appeared on the verdict sheet, along with two columns, one for the jury's award and the other for the JNOV.

 JURY JNOV
A. Past medical expenses incurred $60,932.27 $ 60,932.27
B. Future medical expenses $ -0- $ 10,000.00
C. Past loss of income $47,204.00 $ 30,000.00
D. Future loss of earning capacity $ -0- $100,000.00
E. Past physical pain, suffering, and disability $10,000.00
 > $300,000.00
F. Future physical pain, suffering, and disability $ -0-
G. Past mental anguish and emotional distress $10,000.00
 > $100,000.00
H. Future mental anguish and emotional distress $ -0-
I. Loss of enjoyment of life $ -0- $ 50,000.00
J. Shock, anxiety, anguish, and distress at being
 present at the death of her mother, Mrs. Marie
 Scheffer $ -0- $ 25,000.00
K. Loss of love, affection, support, society, and association
 for the wrongful death of Plaintiff's
 mother, Mrs. Marie Scheffer $ -0- $150,000.00

It will be observed that the JNOV reduced the jury's award for Item C. As to Item K, the defendants do not dispute the propriety of a JNOV award, but they dispute the amount.
We will discuss each individual item of damages complained about separately.

General Damages

Physical Pain, Suffering, and Disability
The jury awarded $10,000 for past physical pain, suffering, and disability, but failed to make an award for future physical pain, suffering, and disability. The trial court lumped the two together and awarded a total of $300,000.
When the Pathfinder hit the tree, Fordher seatbelt was momentarily disengaged was thrown forward into the seat in front of her, where her mother was sitting, and into the windshield. Her right shoulder and left elbow were both dislocated. She had a laceration of her left leg and right fifth finger. Glass from the windshield was embedded in her forehead and arm. It was later discovered that she had a fibular fracture next to her left knee.
Ford was hospitalized from June 30 to July 11, 1996. While in the hospital, Dr. Douglas Gamburg, the orthopedic surgeon who treated her for her injuries, performed *487 closed-reduction surgery on her elbow since it was completely dislocated posteriorly, or out the back. Several days after surgery it was determined that Ford could not raise her fingers indicating that the radial nerve was impaired which was a post-operative complication. Ford had recurrent dislocations due to instability in the elbow joint which had to be reduced several times after she left the hospital, finally requiring an open reduction.
Ford's dislocated shoulder also had to be relocated. After continuing problems with her shoulder, it was discovered that she had a torn rotator cuff, which required surgery. Dr. Gamburg stated that she would continue to have persistent pain which was a direct result of the accident. In addition to the fracture and lacerations of her left leg, there was an element of aggravation of her pre-existing degenerative arthritis in her left knee that was caused by the accident. Dr. Gamburg explained that the accident thus contributed to the pain, swelling, and limitation of movement in her left knee.
Dr. Gamburg explained that as a result of the injuries, Ford now had permanent restriction of movement and loss of strength in her elbow. The permanent radial nerve degeneration resulted in an alteration of her sensibility or ability to appreciate modalities of sensation such as touch, heat, and cold. Ford has weakness, loss of motion, and persistent pain as a direct result of her accident.
He estimated major permanent functional impairments of three extremities because of loss of motion and strength: 40% permanent functional disability of her right upper extremity; 35% of her left upper extremity; and 25% of her left lower extremity. Only part of the disability of the lower extremity was attributable to the injury, but the entire disabilities of the upper extremities were caused by the injury. Dr. Gamburg testified that the pain in her left knee would increase over time due to the nature of degenerative arthritis. She would also have discomfort in her right shoulder from time to time. Although her left elbow had not been particularly painful, she had continued complaints of distorted sensations. Dr. Gamburg's testimony was the only medical testimony offered in the case.
After the accident, one of Ford's daughters moved in with her to take care of her. Ford and her daughters testified that she continued to have pain every day. She cannot sleep in a bed and has a recliner in her bedroom. She cannot raise her arms up. She cannot wear clothes that fasten in the back with buttons and zippers because she cannot reach the buttons and zippers. The family further testified that it is impossible for her to raise her arms to brush the back of her hair and that at times she spills food when her hand gets close to her mouth.
This evidence was not disputed nor was the credibility of Ford ever called into question. We agree with the trial judge that the jury's award for physical pain, suffering, and disability was unreasonable, emphasized by the fact that it awarded nothing to her for the future, when clearly she will have future pain, suffering, and a significant disability. We also cannot say that the trial court's award of $300,000 was an abuse of discretion. Ford suffered a myriad of injuries and required several surgeries. She was in the hospital four times. She will suffer from her permanent disabilities particularly involving both upper extremities. She had to retire from teaching and will continue to suffer problems into the future.

Mental Anguish and Emotional Distress
The jury awarded $10,000 for past mental anguish and emotional distress but none for the future. The trial court lumped the award for past and future damages together and awarded $100,000, an increase of $90,000.
While Ford was in the hospital, one of her daughters had to attend to the funeral plans for Ford's mother who died in the *488 accident. Ford then had to get permission to leave the hospital and she attended the funeral in a wheelchair. Ford stated that because of the accident, she could not tend to her personal needs, which included going to the bathroom and bathing, and required the help of her daughters. She is right-handed and has a problem with strength and raising her right arm to feed herself. She drops food on her clothes. She testified that this is embarrassing. The functional problems with her upper extremities are permanent. Ford stated that she loved attending sports, especially college events, and that she cannot do that anymore.
The jury's award of $10,000 for past mental anguish and emotional distress properly recognized this element of injury. Its failure to award anything for future mental anguish and emotional distress was unreasonable. The evidence in the record is compelling that Ford will suffer future mental anguish and emotional distress, for the reason that the physical causes of her anguish and distress are permanent. We find no abuse of discretion in the total award made by the trial judge.

Loss of Enjoyment of Life
The jury did not make an award for loss of enjoyment of life. The trial court awarded $50,000. State Farm argues that this damage award is duplicative of the awards for pain and suffering, disability, mental anguish, and emotional distress. "[L]oss of enjoyment of life may be included within the category of general damages. However, it is not, of necessity, duplicative of `physical and mental pain and anguish, past and future, and any permanent disability.'" Richard v. Teague, 92-17, p. 22 (La.App. 3 Cir. 5/4/94); 636 So.2d 1160, 1174, writ denied, 94-1934 (La.11/11/94); 644 So.2d 388.
Testimony from Ford and her daughters revealed that she has had to alter her lifestyle as a result of this accident. Her kitchen had to be rearranged so she could reach items. She has problems eating, dressing, and brushing her hair. She also sleeps in a recliner. Ford is tired by the evening and does not have the stamina she had before. The way she goes about her daily living has been changed in significant ways, rendering life less enjoyable, and the changes are permanent.
Given the testimony, we find that an award for loss of enjoyment of life was warranted in this case in addition to the other awards. Therefore, the trial court was reasonable in granting a JNOV on this element of loss. We also find that the award of $50,000 was not an abuse of discretion.

Shock, Anxiety, Anguish, and Distress at Being Present for the Death of Her Mother, Mrs. Marie Scheffer
The jury declined to make an award to Ford for this element of damage listed on the verdict form. In granting a JNOV on this issue of damages, the trial court made an award of $25,000. We must disagree with our learned brother as to this item.
Louisiana Civil Code Article 2315.6 provides for the recovery of damages for mental anguish or emotional distress of certain classes of bystanders who view an event causing injury to another person or come upon the scene soon thereafter. It is often called the "bystander recovery law." Trahan v. McManus, 96-669 (La.App. 3 Cir. 2/19/97); 689 So.2d 696, reversed on factual grounds, 97-1224 (La.3/2/99); 728 So.2d 1273. In order to recover damages under Article 2315.6, Ford had to prove four elements by a preponderance of the evidence:
(1) [she] viewed an event, or came upon the scene of the event, where injury was suffered by another; (2)[she] was closely related to the injured party, pursuant to subsection (A) of the statute; (3) the injured person suffered such harm that the claimant can be reasonably expected to suffer serious mental anguish or emotional distress from witnessing the experience; and (4) the claimant's mental *489 anguish must be severe, debilitating and foreseeable.
Id. at p. 15; 706.
State Farm argues that it was error for the trial court to grant a JNOV on this issue because there was no showing in the record that Ford observed any suffering by her mother and in fact the trial court sustained its motion for directed verdict as to pre-death shock, anxiety, anguish, and distress of Scheffer.
While it is true the trial court agreed with State Farm that there was no evidence to support a claim for survival damages of Scheffer, this did not affect Ford's claim under Article 2315.6. It is, however, a fact to consider under Article 2315.6 in determining whether Ford proved her entitlement to damages for anguish and distress.
The evidence in the case clearly establishes that Scheffer did not suffer in this accident. Her death was immediate. Although Ford was distressed over the death of her mother, there is no evidence that her distress was any more serious, severe, and debilitating than a person would normally experience with the death of a loved one. As explained by the supreme court in Lejeune v. Rayne Branch Hosp., 556 So.2d 559, 570 (La.1990):
The emotional distress sustained must be both serious and reasonably foreseeable to allow recovery. Serious emotional distress, of course, goes well beyond simple mental pain and anguish. Compensation for mental pain and anguish over injury to a third person should only be allowed where the emotional injury is both severe and debilitating. For instance, ... "serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." A non-exhaustive list of examples of serious emotional distress includes neuroses, psychoses, chronic depression, phobia and shock.
We find that the trial court erred in granting JNOV on this aspect of damages. The jury could have reasonably believed that Ford failed to prove this claim by a preponderance of the evidence.

Loss of Love, Affection, Support, Society, and Association for the Wrongful Death of Plaintiff's mother, Mrs. Marie Scheffer
The jury made no award for this element of damages. The trial court granted JNOV and awarded $150,000. Both State Farm and the DOTD do not disagree that the jury erred in failing to make any award, but argue that $50,000 would have been a more appropriate amount.
"The elements of damage for a wrongful death action are loss of love and affection, loss of services, loss of support, medical expenses and funeral expenses." Holt v. Cannon Exp. Corp., 31,271, p. 10 (La.App. 2 Cir. 12/11/98); 722 So.2d 433, 440, writ denied, 99-0104 (La.4/23/99); 742 So.2d 881.
The evidence revealed that Ford and her mother had a very close and loving relationship. Living in the same town, they talked on the phone everyday and often went on outings together. They regularly ate out on Friday nights. On Saturdays they went shopping. Ford and her mother attended other events on a regular basis, like craft shows and Mardi Gras parades, and visited with kin who lived out of town. Ford testified that her mother decorated her Christmas tree for her while she was teaching school. Her mother bought Ford things for her home including a new oven, a refrigerator, and a TV. Her mother also waited at her house or the daughters' houses whenever a repairman was needed and Ford could not be there. Ford testified that her mother even brought her lunch to school whenever she forgot it. These details bespoke a love and loss no one could dispute.
*490 Reviewing this evidence, we find that the trial court's award of $150,000 was not abusively high. Given the trial court's vast discretion, we will not disturb it.

Special Damages

Medical Expenses
The jury awarded $60,932.27 for past medical expenses which the trial court did not change. State Farm and the DOTD do not complain about this award. The jury failed to award anything for future medical expenses while the trial court awarded $10,000. State Farm and the DOTD claim that this was error. We agree.
Dr. Gamburg was very clear in his testimony that Ford was a candidate for knee replacement surgery in the future based on the degree of degenerative arthritis she had before the accident. He testified that the high probability of the need for a knee replacement was based on the severity of her degenerative change. However, he said that she would need the surgery with or without the injuries from the accident. There was no other evidence regarding future medical expenses. Reasonable people could disagree on the need for future medical attributable to this accident. We find that the trial court erred in granting a JNOV as to this element of damage.

Past Loss of Income
The trial judge reduced the amount of damages the jury awarded for past loss of income from $47,204 to $30,000. Ford answered the appeal and asked generally for an increase in damages. We find that the trial court was wrong in reducing this award. Her entitlement to $47,204 was clearly set forth in the record, and it was not contested.

Future Loss of Earning Capacity
With regard to loss of earning capacity, the jury did not award anything to Ford. In granting JNOV on this element of damages the trial court awarded $100,000.
This court discussed the meaning of loss of earning capacity in Batiste v. New Hampshire Ins. Co., 94-1467, p. 3 (La. App. 3 Cir. 5/3/95); 657 So.2d 168, 170, writ denied, 95-1413 (La.9/22/95); 660 So.2d 472 (citations omitted):
Loss of earning capacity is not the same as lost wages. Rather, earning capacity refers to a person's potential. Earning capacity is not necessarily determined by actual loss. While the plaintiff's earnings at the time of the accident may be relevant, such figures are not necessarily indicative of his past or future lost earning capacity. The plaintiff need not be working or even in a certain profession to recover this type of award. What is being compensated is the plaintiff's lost ability to earn a certain amount, and he may recover such damages even though he may never have seen fit to take advantage of that capacity.
In determining whether a personal injury plaintiff is entitled to recover for the loss of earning capacity, the trial court should consider whether and how much plaintiff's current condition disadvantages him in the work force. The trial court should thus ask itself what plaintiff ought to be able to have earned but for his injuries and what he may now earn given his resulting condition.
The very nature of lost earning capacity makes it impossible to measure the loss with any kind of mathematical certainty. The facts of each case must take into account a variety of factors, including the plaintiff's condition prior to the accident, his work record prior to and after the accident, his previous earnings, the likelihood of his ability to earn a certain amount but for the accident, the amount of work life remaining, inflation, and the plaintiffs employment opportunities before and after the accident.
Ford was 58 years old at the time of the accident. She was a teacher with the Rapides Parish school system. Dr. Gamburg testified that Ford has impairments from *491 an orthopedic standpoint which render her incapable of fulfilling most of the duties of a schoolteacher. He stated that it is her ability to get up and down, to move about, and to use her upper extremities that has been affected but that she does have some capability of performing private tutoring because she does have her mental faculties. However, Ford testified that she did not really like tutoring. She did state that when she retired, she planned on doing some substitute teaching for extra money.
Dr. Randolph Rice, a professor of economics at LSU, testified that at the time of trial Ford had 5.1 years of work-life expectancy to the age of 65. Dr. Rice testified that, with an annual salary of $22,478, Ford would have suffered a loss of $105,862 in present-value dollars. He also did an estimate based on what she could earn doing some private tutoring after she retired. He estimated that she would earn $20,160 a year, if she tutored privately for six years after retirement, for a total loss of $96,532 converted into present-value dollars.
Ford retired from the school system on January 8, 1998. The jury could have concluded that she would not have earned any money after retirement since she testified that she did not want to do private tutoring. There was no indication in the record whether Ford's retirement was less than expected because she retired earlier than anticipated. The fact of the matter is that she still received her retirement, although earlier. There was also no evidence on what she could earn as a substitute teacher. Since she was close to retirement, it was reasonable for the jury to assume she was receiving what she would have received if not for the accident.
With this evidence, we find it reasonable for the jury to conclude that Ford did not suffer a loss of earning capacity. The trial court erred in granting a JNOV with respect to loss of earning capacity damages.

SUBROGATION
State Farm asserted a cross-claim against the DOTD for payments it made to the occupants of the Pathfinder, as well as for sums it might become obligated to pay them under the UM coverage. State Farm claims that the trial court erred in dismissing this claim pursuant to the DOTD's oral motion for a directed verdict.
State Farm's basis for its subrogation claim is found in the UM statute, La.R.S. 22:1406(D)(4):
In the event of payment to any person under the coverage required by this Section and subject to the terms and conditions of such coverage, the insurer making such payment shall, to the extent thereof, be entitled to the proceeds of any settlement or judgment resulting from the exercise of any rights of recovery of such person against any person or organization legally responsible for the bodily injury for which such person against any person or organization legally responsible for the bodily injury for which such payment is made, including the proceeds recoverable from the assets of the insolvent insurer.
In Egros v. Pempton, 606 So.2d 780, 785 (La.1992), the supreme court held that this language "provides that whenever a UM insurer makes payment to an insured for bodily injuries, the insurer is entitled to recover against `any person or organization legally responsible' for the bodily injury for which such payment is made." The court then held that "this language is broad enough to encompass the subrogation right of a UM insurer against a nonmotorist joint tortfeasor." Id.
At the time of the accident in Egros, La.Civ.Code art. 2324 provided for solidary liability among joint tortfeasors. Egros also involved a situation where State Farm, the UM insurer of the plaintiffs, had asserted a cross-claim against the other defendants seeking to recover from them all sums it might be required to pay under its UM coverage. The supreme court explained that by means of the cross-claim *492 "State Farm is exercising through subrogation the rights the plaintiffs would have against the remaining tortfeasor...." Id. at 786. Based on Article 2324 as it read at the time of the accident, the supreme court noted that "[t]he plaintiffs could have sought recovery for the entire debt from [the remaining tortfeasor]....[t]hus, State Farm is entitled to recover the full measure of what it has paid from the remaining solidary tortfeasor...." Id.
In footnote 10 of Egros the supreme court recognized that Article 2324 had been amended in 1987 to provide that solidary liability among joint tortfeasors was limited to the extent of 50% of the damages recoverable by the plaintiff. The supreme court declined to address the issue of whether this amendment would change the recovery rights of the UM insurer.
Article 2324 was once again amended in 1996, which finally abolished solidary liability except among those who commit or conspire to commit intentional or willful harm. A defendant's liability exposure is now limited to that individual defendant's percentage-fault share of the total damages. This is the version in effect at the time of this accident. The DOTD argues that the virtual abolition of solidary liability among joint tortfeasors has somehow eliminated State Farm's legal right to subrogation under the UM statute. We cannot agree.
The wording of La.R.S. 22:1406(D)(4) has not changed. We conclude that State Farm still has the right of subrogation against the DOTD. As explained by the supreme court in State Farm Mut. Auto. Ins. Co. v. Berthelot, 98-1011 (La.4/13/99); 732 So.2d 1230, State Farm, as the new obligee by virtue of legal subrogation, may recover the debt that the DOTD, the negligent tortfeasor, owed to Ford, the victim of the DOTD's negligence. Therefore, State Farm is subrogated to Ford's right against the DOTD for 35% since this is the limit of the right Ford has against the DOTD.

CONCLUSION
For the above reasons, the DOTD is cast with 35% of the fault and unknown driver is cast with 65% of the fault. The JNOV as to the awards for shock, anguish, and distress at being present at the death of her mother, for future medical expenses, and loss of earning capacity are reversed, and the jury verdicts of $0 are reinstated. The JNOV on the award of past loss of income is set aside, and the jury award of $47,204 is reinstated. We also reverse the trial court's judgment dismissing State Farm's cross-claim against the DOTD, and we render judgment in favor of State Farm and against the DOTD recognizing the right of subrogation. In all other respects, the JNOV is affirmed.
Costs of this appeal are assessed equally to Carole Ford, State Farm and the DOTD.
AMENDED IN PART; REVERSED IN PART; AFFIRMED IN PART; AND RENDERED.
NOTES
[1] The Fisers sued but settled.