# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 03-1754

**MELVIN GUILLOT, ET AL.**

**VERSUS**

**JOHN DOE, ET AL**

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NUMBER 98-387
HONORABLE JULES D. EDWARDS, III, DISTRICT JUDGE

**********

**BILLIE COLOMBARO WOODARD**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, Billie Colombaro Woodard, and Marc T. Amy, Judges.

**AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.**

Amy, J., concurs in part, dissents in part, and assigns reasons.


Dean A. Doherty
Post Office Box 3372
Lafayette, LA 70502
(337) 269-7300
COUNSEL FOR PLAINTIFFS/APPELLEES:
    Melvin Guillot and Tammy Guillot

Brian T. Roy
Preis, Kraft & Roy
Post Office Drawer 94-C
Lafayette, LA 70509
(337) 237-6062
COUNSEL FOR DEFENDANTS/APPELLANTS:
    Diane Lubiecki, Julien Lubiecki, and Allstate Insurance Company

WOODARD, Judge.

During a birthday party/sleep over at Mrs. Diane Lubiecki and Mr. Julien Lubiecki's home, a child attending the party accidently shot Jonathan Guillot in the forehead while attempting to unload a pellet gun. On appeal, the Lubieckis request that this court reverse the trial court's allocation of fault and its $45,000.00 general damage award. Also, the Lubieckis contend that the trial court improperly awarded Mrs. Tammy Guillot $5,000.00 for her mental anguish/emotional distress, under La.Civ.Code art. 2315.6. We affirm the trial court's $45,000.00 general damage award and its allocation of fault, but we reverse its decision to award Mrs. Guillot damages.

\* \* \* \* \*

On January 24, 1997, the Lubieckis invited several children to attend a birthday party/sleep over at their home for their eleven-year-old son, Robert. Previously, Robert told the children who attended the party to bring their BB or pellet guns, if they had one, so they could go on a hunting trip for birds and other small animals.

The Guillots initially agreed to allow two of their sons, Brandon and Ryan, to spend the night, only, if the Lubieckis promised to supervise the children while they were using the guns. Specifically, Mr. Lubiecki told the Guillots: "[D]on't worry about it. You know, we'll treat [your children] like they're our own." The Lubieckis also promised to lock the guns up in their bedroom closet when the children were not hunting. At trial, Mr. Guillot recalled Mr. Lubiecki's words of assurance: "I promise you [the guns] will be locked up. Nobody will be around them without me supervising."

The Guillots did not want their youngest son, Jonathan, to spend the night, since he was only seven years old at the time and had never slept over at a friend's house. However, after receiving repeated assurances from the Lubieckis, the Guillots eventually allowed him to spend the night, as well. Mr. Guillot testified:

> A       [I] . . . went over the same thing again . . . . Asked [Mr. Lubiecki], "You know, you're sure y'all going to watch him, and you know, [Jonathan's] my little guy [and] he's only . . . seven . . . ."

1

> [He said,] "Oh, yes. Don't worry about it."
>
> . . . .

A      [He said,] "[Jonathan's] going to be fine. We're going to watch him; treat him like our own."

Basically, . . . Mr. Lubiecki probably thought I was a nut because I kept going over and over it. . . .

Q      You repeated the same instructions - -

A      Yes, sir.

Q      - - about gun safety?

A      Yes, sir.

Q      And were you given the same assurance?

A      Yes, sir.

Later that night, the Lubieckis went to bed at approximately 10:00 p.m., but they did not lock the guns in their closet as they promised. At around midnight, before Brandon went to bed, he placed his pellet gun in Robert's *unlocked* bedroom closet with the rest of the guns that were already in there, which allegedly included a couple of shotguns and a twenty-two (.22) caliber rifle.

The following morning, on January 25, 1997, Mr. Lubiecki went outside to his shed, which was approximately thirty yards from the house, to work on his van. Soon afterwards, Mrs. Lubiecki, who was unaware of the fact that her husband was in the shop, drove to the store and, thus, left the children that were still in the house without adult supervision.

At some point after Mrs. Lubiecki left the home, one of Robert's friends, Belton Richard, III, found Brandon's pellet gun and accidentally fired it, causing a pellet to strike Jonathan in the forehead. Belton dropped the rifle and ran outside screaming: "I shot him. I shot him. Help, help, help."

When Mr. Lubiecki heard Belton's screams, he found Jonathan and inspected the wound to his head. Mr. Lubiecki told Jonathan that "it was just a nick" and placed

a Band-Aid on it. Robert's older sister, Shannon, who came in the house soon after the accident, took the Band-Aid off and cleaned the wound "with a Q-Tip."

After treating his wound, she called the Guillots to tell them about their son's injury. When Mrs. Guillot answered the phone, Shannon told her: "[Jonathan's] been scratched, and I don't think it's really anything, but you might want to come and look."

Mrs. Guillot had a bad feeling that the situation was more serious than Shannon had revealed, so she told her husband the news and they rushed to the Lubieckis' home. When they arrived, Mr. Lubiecki was outside on the porch. As they approached the house, the first thing he told them was that, when he heard Belton screaming "I shot him," he initially thought that Belton had grabbed the twenty-two (.22) in the closet. Mr. Lubiecki also expressed how relieved he was when he found out that Jonathan had been shot with a pellet gun: "Man, thank God it was a pellet gun [because] I thought [Belton] had grabbed the twenty-two (.22)."

At trial, Mr. Guillot described Jonathan's condition when they first saw him:

> Q        Okay. Was [Jonathan] crying?
>
> A        Just a little. He was more like shaking, scared, you know, shaken up.
>
> Q        Okay. Could you see any blood on his forehead?
>
> A        Yes.
>
> Q        Was there a Band-Aid covering the wound?
>
> A        Yes sir.
>
> Q        Despite the Band-Aid, could you still see blood on his head?
>
> A        Yes sir.
>
> Q        Was it dripping or was it just dried up?
>
> A        It was kind of still wanting to bleed, you know, but it wasn't gushing or anything. [Mr. Lubiecki and Shannon] had cleaned him up.

When Mrs. Guillot saw her son's condition, she began to cry. She was also very angry, since she believed Shannon misrepresented the severity of Jonathan's injury by calling it a mere scratch.

Soon afterwards, the Guillots took Jonathan to the emergency room at Our Lady of Lourdes Regional Medical Center (OLOL). Dr. Scott Thompson, the treating emergency room physician, made the following notations, concerning Jonathan's injury, in OLOL's "Emergency Record/Physician's Record":

> HISTORY OF PRESENT ILLNESS: This little boy took a BB or pellet to the right forehead. He didn't get hit anywhere else. He said it stung a little bit.
>
>  . . . .
>
> PHYSICAL EXAMINATION: VITAL SIGNS: Stable. GENERAL: Polite little boy. He has a little divot of skin about the size of a BB missing on the right mid forehead. Superior and lateral to that is a little knot under the skin consistent with a BB. It is about an inch removed from the entry site. There is no other bony irregularity. . . .
>
> IMPRESSION: BB SUBCUTANEOUS.
>
> TREATMENT: I told the family that because this is a young boy and it is on the face, I am going to ask one of the plastic's people to remove it. I did try to "thumbnail" the BB forward and it seems pretty much locked in the skin.

Later, Dr. Kenneth L. Odinet, a plastic surgeon, also examined Jonathan's wound. He noted:

> On radiograph, you can see the pellet embedded in the frontal bone. I saw the child initially in the emergency room, having [no] symptoms and no complaints and I told the parents we could just leave the pellet there, but they insisted on removal.

On January 28, 1997, three days after Jonathan was released from the emergency room, Dr. Odinet performed a minor surgical procedure at Lafayette General Medical Center to remove the pellet.

On February 3, 1997, he returned to Dr. Odinet for a follow-up examination, after which the doctor informed the Guillots that Jonathan's physical wound would heal quickly; although, he warned that psychological treatment might be necessary in

4

the future to heal any emotional scars.

Approximately five years after being shot, in December of 2001, Jonathan opened up about the accident for the first time. He asked his parents: "Why would [Belton] want to do that to me?" He also told his mother he blamed himself because he had asked to spend the night at Robert's house. At this point, Mrs. Guillot decided that her son needed psychological counseling.

On January 29, 2002, Dr. Maureen Brennan, a clinical psychologist, met with the Guillots to discuss Jonathan's medical history, background, and their goals for therapy. Afterwards, Dr. Brennan met with Jonathan on three separate occasions for therapy and diagnosed him with "chronic adjustment disorder." After the third session, Dr. Brennan noted that Jonathan's condition had improved dramatically; as such, she did not expect him to need further counseling.

Sometime later, at the request of the Lubieckis' insurer, Allstate Insurance Company, Dr. Kenneth R. Bouillion performed an independent psychological evaluation of Jonathan's condition. According to Dr. Bouillion, Dr. Brennan's initial diagnosis of Jonathan's condition as "chronic adjustment disorder" was accurate.

On May 9, 2003, the trial court signed a final judgment, awarding damages as follows: (1) $45,000.00 in general damages and $3,454.76 in special damages to Mr. Guillot, as Jonathan's representative; and (2) $5,000.00 in general damages to Mrs. Guillot.

On appeal, the Lubieckis contend that the trial court erred: (1) by awarding Mr. Guillot, as Jonathan's representative, $45,000.00 in general damages; (2) by finding them 85% at fault for Jonathan's damages; and (3) by awarding Mrs. Guillot damages for her mental anguish/emotional distress.

* * * * *

**EXCESSIVE DAMAGES**

The Lubieckis assert that $45,000.00 is an excessive general damage award under the circumstances of this case, specifically, given Jonathan's particular injuries.

An appellate court should rarely disturb an award of damages due to the great

and, even, vast discretion vested in the trial court.[1] We can disturb such awards, only, when the trial court clearly abused its discretion.[2]

Reasonable people often disagree over the appropriate measure of general damages in a particular case.[3] Yet, "[i]t is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award."[4]

We should not rely on a comparison of prior awards in cases with similar medical injuries to decide whether the trial court abused its discretion.[5] "The primary considerations in assessing damages are the severity and duration of the injured party's pain and suffering."[6] The facts and circumstances of this case, alone, should determine an award's adequacy or inadequacy.[7] Therefore, in this instance, we must determine whether the trial court's award for Jonathan's particular injuries, under the particular circumstances, was a clear abuse of its broad discretion.[8]

While attempting to unload a pellet gun, Belton accidentally caused it to discharge. The pellet that struck Jonathan lodged against his skull and caused "a 2 to 3 mm open wound" to his forehead. This wound did not bleed profusely; however, it was still bleeding when his parents got to the scene of the accident.

Dr. Odinet advised the Guillots that they could safely leave the pellet in Jonathan's head, but they insisted that it be surgically removed. During surgery, he was given surgical anesthesia, which involved the use of intravenous sedation as well

---

[1]*Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994).

[2]*See Coco v. Winston Indus., Inc.*, 341 So.2d 332 (La.1976).

[3]*Youn*, 623 So.2d 1257.

[4]*Id.* at 1261.

[5]*See Id.*

[6]*Iorio v. Grossie*, 94-846, p. 8 (La.App. 3 Cir. 10/4/95), 663 So.2d 366, 372 (citing *Andres v. Liberty Mutual Ins. Co.*, 568 So.2d 651 (La.App. 3 Cir. 1990)).

[7]*See Youn*, 623 So.2d 1257.

[8]*See Id.*

as nitrous oxide. Afterwards, he had headaches for three months and was left with a visible scar that bothered him continuously until the time of trial.

The Lubieckis correctly point out that the injury to Jonathan's forehead was, fortunately, a very minor wound, and the only residual indication of the wound, "a small pink mark," migrated up his forehead as he grew older to the point it is no longer visible without manipulating his hair. However, while it is true that his physical suffering was negligible, the Lubieckis fail to acknowledge the significance of his psychological injuries.

Jonathan testified that he had nightmares for over a year after the accident. Also, at trial, he acknowledged that he suffered with the following symptoms for more than five years: self-blame, being withdrawn, easily startled by loud noises, trouble concentrating in school because he kept thinking about the accident, a loss of interest in activities that he used to enjoy, and trouble interacting with his siblings.

Jonathan was unable to verbalize his feelings about being shot for almost five years, but, during that time, Mrs. Guillot could see that he was troubled. She gave this account of the dramatic changes she saw in her son's personality and behavior following the accident:

> Before, Jonathan was just my little—I called him my—tambourine shaker. I mean, [he was] just super excited about everything [and he was] always just willing to go anywhere and do anything . . . .
>
> After this accident, Jonathan stayed to himself. He didn't want to really . . . go anywhere. He didn't want to ride his horse. He just seemed like he wasn't trusting of strangers or even of some family members. And he just wasn't himself. He just . . . wanted to stay to [himself], like a little loner.

When she noticed these changes in him, initially, she thought they would pass in time. She testified:

> As a mother, you hope that they'll pass, and at times I saw that they would. I would just speak with him. I'd try to move him right on out of the self-pity stage or the I did something wrong in this little game stage, or [Mr. Guillot and I] did encouragement. We tried to just get him to move along.

She also sought advice from her pastor, the pastor's wife, and other friends that attended her church. However, not until Jonathan reached adolescence, when he was first able to reveal to her the inner turmoil that he was suffering with due to the accident, did she realize that he needed professional counseling. Nevertheless, the Lubieckis insist that, by not getting a professional to treat their son earlier, the Guillots failed to mitigate his damages.

"[A]n accident victim has a duty to exercise reasonable diligence and ordinary care to minimize [his/her] damages after the injury has been inflicted."[9] The plaintiff does not need to make extraordinary or impractical efforts, but s/he must undertake those that are reasonably prudent under the circumstances.[10] The defendant bears the burden of proving what extent the plaintiff should have mitigated his/her damages.[11] "[T]he rule of mitigation of damages is to be applied with extreme caution."[12]

Under the circumstances, we believe the Guillots exercised reasonable diligence in dealing with Jonathan's psychological injuries. Dr. Brennan confirmed that the reason Jonathan, who was seven years old at the time of the accident, could not express his feelings for almost five years was because he needed time for his verbal skills to develop. Also, she believed the Guillots handled the situation appropriately by seeking professional counseling as soon as their son could express himself.

Anyone injured through the fault of another is entitled to full indemnification for his/her damages.[13] Defendants take victims as they find them and are responsible for all natural and probable consequences of their tortious conduct.[14]

In this instance, Jonathan was a young child not yet able to verbalize his feelings. As such, the Defendants must bear full responsibility for Jonathan's

---

[9]*Jacobs as Tutor of Jacobs v. New Orleans Pub. Serv., Inc.*, 432 So.2d 843, 845 (La.1983).

[10]*Id.*

[11]*Moreau v. N. Am. Fire & Cas. Ins. Co.*, 01-976 (La.App. 5 Cir. 12/26/01), 806 So.2d 809.

[12]*Id.* at 816.

[13]*Wainwright v. Fontenot*, 00-492 (La. 10/17/00), 774 So.2d 70.

[14]*Am. Motorist Ins. Co. v. Am. Rent-All, Inc.*, 579 So.2d 429 (La.1991).

suffering during those years when his silence prevented him from getting professional treatment for his psychological injuries.

We cannot say that it was an abuse of discretion for the trial court to award $45,000.00 in general damages. Clearly, the award is not the result of passion or prejudice, and it bears a reasonable relationship to the proved damages.[15] Other triers of fact could have determined that a lower award was more appropriate, but from the entirety of the evidence, viewed in the light most favorable to the prevailing party in the trial court, we conclude that a rational trier of fact could have fixed this award at the level set.[16] Moreover, this is not one of those unusual cases where the award is contrary to reason.[17]

Thus, we affirm the trial court's $45,000.00 general damage award.

**ALLOCATION OF FAULT**

The trial court concluded that the Lubieckis were 85% at fault, Cindy Fridge, as Belton's representative, was 10% at fault, and the Guillots were 5% at fault. The Lubieckis, however, assert that the Guillots, who allowed their son to spend the night when they had full knowledge of the presence and intended use of pellet guns, should bear a percentage of fault equal to theirs.

Concerning an appellate court's review of a trial court's allocation of fault, our supreme court in *Clement v. Frey* explained: "[T]here is an analogy between excessive or inadequate quantum determinations and excessive or inadequate fault percentage determinations."[18] In both, unlike the appellate court, the trier of fact has the benefit of witnessing the entire trial and reviewing first hand all the evidence.[19]

The trier of fact's allocation of fault is a question of fact; therefore, we should not overturn its determination, absent a showing of manifest error.[20] If the trial court's

---

[15]*See Youn*, 623 So.2d 1257.

[16]*See Id*.

[17]*See Id*.

[18]95-1119 (La. 1/16/96), 666 So.2d 607, 610.

[19]*Id.*

[20]*See Conrad v. City of New Iberia*, 03-121 (La.App. 3 Cir. 6/13/03), 847 So.2d 784.

determination was reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.[21]

In the instant matter, the trial court succinctly stated its basis for its allocation of fault:

> Before agreeing to allow Jonathan to spend the night, the Guillots talked with the Lubieckis about gun safety. The Lubieckis assured the Guillots that all children attending the sleep over would be supervised. The Lubieckis specifically said the various guns in the home would not be where the children would have access to them. However, prior to the Guillots leaving the Lubiecki's home[,] they observed several pellet and BB rifles and pistols in an area that was accessible to the children. On the next morning, [Mr. and Mrs. Lubiecki] exited the home with children still at the residence[,] and the guns were still accessible to the children. As a direct result of this lack of supervision, Belton Richard was able to negligently handle the pellet gun and injure Jonathan. There were no adults present in the Lubiecki home when Belton injured Jonathan.
>
> The Court hereby apportions the fault as follows: Diane and Julien Lubiecki, eighty-five (85) percent; Belton Richard, ten (10) percent; and Melvin and Tammy Guillot, five (5) percent.

After reviewing the record, we find no manifest error and agree with the trial court's determination that, due to the Lubieckis' lack of supervision, they should bear the greatest percentage of fault.

Therefore, we affirm its allocation of fault.

**BYSTANDER RECOVERY**

The trial court awarded Mrs. Guillot $5,000.00 for her mental anguish/emotional distress, under La.Civ.Code art. 2315.6, from witnessing the wound to Jonathan's forehead soon after Belton shot him. Nevertheless, the Lubieckis contend that she is not eligible for bystander recovery.

Two categories of cases allow claimants to recover for their mental anguish/emotional distress: (1) traditional cases, in which a defendant's negligence is aimed directly at the plaintiff and (2) bystander recovery cases, in which the defendant's negligence is aimed at a third person and the plaintiff suffers emotional

---

[21]*Id.*

distress/mental anguish from having viewed the injury.[22] Clearly, Mrs. Guillot's claim falls within the latter category, since she was a bystander who witnessed her son's injury soon after he was shot with a pellet gun.

Louisiana Civil Code Article 2315.6, which does not interfere with traditional theories of negligent infliction of emotional distress and solely deals with bystander recovery,[23] provides:

> A.  The following persons who view an event causing injury to another person, *or who come upon the scene of the event soon thereafter*, may recover damages for mental anguish or emotional distress that they suffer as a result of the other person's injury:
>
> (1) The spouse, child or children, and grandchild or grandchildren of the injured person, or either the spouse, the child or children, or the grandchild or grandchildren of the injured person.
>
> (2) The father and *mother of the injured person*, or either of them.
>
> (3) The brothers and sisters of the injured person or any of them.
>
> (4) The grandfather and grandmother of the injured person, or either of them.
>
> B.  To recover for mental anguish or emotional distress under this Article, *the injured person must suffer such harm that one can reasonably expect a person in the claimant's position to suffer serious mental anguish or emotional distress from the experience*, and the *claimant's mental anguish or emotional distress must be severe, debilitating, and foreseeable*.  Damages suffered as a result of mental anguish or emotional distress for injury to another shall be recovered only in accordance with this Article.

(Emphasis added.)  Accordingly, Article 2315.6 allows certain classes of bystanders, who view an event causing injury to another person or come upon the scene soon afterwards, to recover damages for their mental anguish/emotional distress.[24]

---

[22]*Norred v. Radisson Hotel Corp.*, 95-748 (La.App. 1 Cir. 12/15/95), 665 So.2d 753.

[23]*Id.*

[24]*Ford v. State*, 99-1297 (La.App. 3 Cir. 4/12/00), 760 So.2d 478, *writ denied*, 00-1935 (La. 9/27/00), 769 So.2d 1214, *writs denied*, 00-1938, 00-1864 (La. 9/29/00), 770 So.2d 352, 770 So.2d 350.

Bystander damages are available when *serious emotional distress* arises directly and immediately from the claimant's observation of a traumatic injury-causing event to the direct victim or from the observation of the aftermath of the traumatic injury-causing event soon thereafter.[25]   Thus, our Legislature intended to compensate claimants for his/her immediate shock after witnessing the direct victim's harm that is both severe and apparent but not for the anguish and distress that normally accompany an injury to a loved one under all circumstances.[26]  As our supreme court explained in *Lejeune v. Rayne Branch Hospital*:

> The emotional distress sustained must be both serious and reasonably foreseeable to allow recovery.  *Serious emotional distress*, of course, goes well beyond simple mental pain and anguish.  Compensation for mental pain and anguish over injury to a third person should only be allowed where the emotional injury is both severe and debilitating.  For instance, . . . "*serious emotional distress* may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case."  A non-exhaustive list of examples of *serious emotional distress* includes neuroses, psychoses, chronic depression, phobia and shock.[[27]]

(Emphasis added.)

In order for Mrs. Guillot to recover, she must prove the following four elements by a preponderance of the evidence:  (1) she viewed an event causing injury to another person, or came upon the scene of the event soon thereafter; (2) she is within the class of relatives able to recover; (3) the injured person suffered such harm that one can reasonably expect someone in her position to suffer *serious emotional distress* from the experience; and (4) her mental anguish/emotional distress must be severe, debilitating, and foreseeable.[28]

Within minutes of the shooting, Mrs. Guillot arrived on the scene.  When she saw Jonathan's forehead bleeding, she broke down and began to cry hysterically.  She continued to cry at the emergency room, so the emergency room doctor decided to

---

[25]*Trahan v. McManus*, 97-1224 (La. 3/2/99), 728 So.2d 1273.

[26]*Id.*

[27]556 So.2d 559, 570 (La.1990).

[28]*See* La.Civ.Code art. 2315.6.

sedate her with Valium.

Notwithstanding, even though the evidence clearly suggests that she was very upset, she did not suffer the degree of "serious emotional distress" our Legislature envisioned. Her anguish was more akin to the anguish and distress that any mother would feel in this situation. Also, in *Trahan v. McManus* the supreme court noted that "the essence of the tort is the shock caused by the perception of the especially horrendous event."[29] (Emphasis added.)

Without minimizing Jonathan's pain and suffering or the seriousness of the accident, we find that this accidental injury, which resulted in a minor physical wound, does not qualify as a "horrendous event." As such, the mental anguish/emotional distress that Mrs. Guillot felt, after viewing her son's injury, is not compensable.

Accordingly, we must reverse the trial court's $5,000.00 award for her mental anguish/emotional distress.

## CONCLUSION

We affirm the trial court's $45,000.00 general damage award and its allocation of fault. However, we must reverse its decision to award Mrs. Guillot $5,000.00 for her mental anguish/emotional distress. We assess all costs of this appeal evenly between the Plaintiffs/Appellees, Melvin and Tammy Guillot, and the Defendants/Appellants, Diane Lubiecki, Julien Lubiecki, and Allstate Insurance Company.

**AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.**

---

[29]728 So.2d at 1279 n.8 (quoting *Lejeune*, 556 So.2d at 570 n.11).

13

NUMBER 03-1754

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

MELVIN GUILLOT, ET AL.

VERSUS

JOHN DOE, ET AL.

AMY, J., concurring in part, dissenting in part.

I agree with the majority that the apportionment of fault is supported by the record and must, therefore, be affirmed. Furthermore, I agree that the award of damages to Mrs. Guillot for her mental anguish/emotional distress following the accident must be reversed. However, I respectfully dissent from the majority's affirmation of the $45,000 in general damages awarded to Jonathan Guillot. Given the limited nature of the injury reflected in the record, I conclude that a substantial reduction in the general damages is required. Therefore, according to the dictates of *Coco v. Winston Indus., Inc.*, 341 So.2d 332 (La.1976), I would reduce the award of general damages to the highest point reasonably within the trial court's discretion.